## In re NORTHERN OHIO TIREWORKERS et al.

[Cite as *In re N. Ohio Tireworkers* (1993), 92 Ohio App.3d 69.]

Court of Appeals of Ohio,
Summit County.

No. 16155.

Decided Dec. 15, 1993.

*Russell Smith* and *R. Bryan Nace,* for appellees Northern Ohio Tireworkers et al.

*Bruce P. Mandel, Timothy M. Fox* and *Leslie Blair Graden,* for appellees Georgia Talc Co., RT Vanderbilt Co., Inc. and NL Industries, Inc.

*Jeffrey M. Embleton, Samuel R. Martillotta, Julius R. Gerlack, Howard G. Sloane* and *Allen S. Joslyn,* for appellee Southern Talc Co.

*Jack Kluznik,* for appellees Pita Realty Ltd., Eastern Magnesia Talc Co. and Engelhard Corp.

*Regina M. Massetti,* for appellee International Talc Co.

*William F. Scully,* for appellees Milwhite, Inc. and North Georgia Minerals & Chemicals Co., Inc.

*Robert L. Tucker,* for appellee Harwick Chemical Co.

*Martin Murphy* and *Dennis Fogarty,* for appellants Owens–Corning Fiberglas.

DICKINSON, Judge.

Defendant Owens–Corning Fiberglas Corporation has appealed from an order of the Summit County Court of Common Pleas that revoked the *pro hac vice* status of its lawyer, David D. Schlachter. Owens–Corning has argued that the trial court incorrectly barred its attorney from representing it in certain product liability suits. This court reverses the trial court's order because there was insufficient evidence before it to support revocation of Schlachter's *pro hac vice* status.

## I

This is an appeal from an order entered in certain product liability suits pending in the Summit County Court of Common Pleas. Those cases are known as the Northern Ohio Tireworker Cases ("Tireworker Cases"). The plaintiffs in the Tireworker Cases are approximately two thousand tireworkers who were allegedly exposed to asbestos in the workplace. There are approximately two hundred defendants, including Owens–Corning. The defendants are entities that have in some way been involved with asbestos or asbestos-containing materials that were supplied to plaintiffs' employers. Included among the defendants are entities that produced or supplied thermal insulation products containing asbestos and entities that produced or supplied talc products containing asbestos.

The judge to whom the Tireworker Cases were assigned entered a case management order that, among other things, divided the plaintiffs in the various cases into separate groups for scheduling purposes. Each group was assigned an identifying Roman numeral between I and CCXX. The groups have been treated, for certain purposes, as separate cases and the Roman numerals used as part of the caption in pleadings and other documents in place of case numbers.

Tilly & Graves, a Colorado law firm, is Owens–Corning's national counsel. David D. Schlachter is a member of the Tilly & Graves firm and is licensed to practice law in Colorado. The trial court granted Schlachter *pro hac vice* status for the purpose of representing Owens–Corning in the Tireworker Cases.

Owens–Corning is a thermal insulation manufacturer. One of the strategies adopted by Owens–Corning has been to suggest that, to the extent any plaintiffs are suffering effects of asbestos exposure, those effects were caused by exposure to asbestos contained in talc products rather than exposure to asbestos in thermal insulation products. As part of that strategy, Owens–Corning retained Dr. Bruce W. Case, a Canadian pathologist, as an expert regarding the effects of exposure to asbestos containing talc products.

Owens–Corning entered into settlements with a number of the plaintiffs, including all those in Groups V through X. The terms of Owens–Corning's settlements with the various plaintiffs have not been revealed to the other defendants. Apparently, however, those terms included an agreement to make Case available to the settling plaintiffs as an expert witness against the talc defendants.

At some point, plaintiffs' counsel apparently revealed to the other defendants that Case was going to testify as an expert for plaintiffs and that his deposition could be scheduled through Schlachter's office. A representative of certain of the other defendants contacted Schlachter's office and determined that Case would be available for a deposition in Montreal, Canada on October 1–2, 1992. A notice for that deposition, served by a representative of those other defendants, stated that the deposition would be taken in "Groups V through XVIII." Among the plaintiffs with whom Owens–Corning had not settled was one of the members of Group XIII.

Schlachter went to Montreal to attend Case's deposition. At some point after he arrived in Montreal, he learned that plaintiffs' counsel and the other defendants' counsel had agreed that the deposition would only be taken for use in Groups V through X. Despite that knowledge, Schlachter met with Case for approximately three hours on the eve of the deposition and appeared at the scheduled location of the deposition the next morning. The other defendants objected to his presence, arguing that the deposition was being taken only for use regarding plaintiffs with whom Owens–Corning had settled. Schlachter argued that he had a right to be present for Case's deposition because Case was Owens–Corning's expert witness for its defense of the claims of other plaintiffs and the issues in those claims were identical to those about which he was to be deposed.

The trial court had previously appointed a referee to resolve discovery disputes that might arise in the Tireworker Cases. The parties, therefore, telephoned the referee and informed him of their dispute. Schlachter argued to the referee that he should be permitted to attend the deposition as an "interested observer" and the other defendants argued that he had no right to be present. The referee informed Schlachter that he could not attend the deposition.

Following the telephone call with the referee, Schlachter spoke with Case outside the presence of the other defendants. He then informed the other defendants that Case had retained him as counsel for purposes of the deposition and that he now had a right to attend the deposition because of his new status. The other defendants again objected and a second telephone call was placed to the referee. The referee again informed Schlachter that he could not attend the deposition.

The deposition then proceeded without further incident. Schlachter remained in the area outside the room in which the deposition was being taken and Case consulted with him several times during breaks.

Following the deposition, certain defendants moved for revocation of Schlachter's *pro hac vice* status in all the Tireworker Cases. They argued that Schlachter should be disqualified from further representation of Owens–Corning because (1) Schlachter's continued representation of Owens–Corning presented a risk of a tainted trial "due to an actual or potential conflict of interest"; (2) Schlachter could not or would not take part in the proceedings "with a reasonable degree of propriety"; and (3) Schlachter had engaged in egregious misconduct that was "likely to affect future proceedings." A hearing on the revocation motion was held before the referee and, on December 23, 1992, the referee issued a Report and Recommendations in which he recommended that Schlachter's *pro hac vice* status be revoked based upon "a truly egregious act of professional misconduct, [that] adversely reflects on the legal profession, [and] materially and substantially interfered with, prejudices, and disrupted the orderly administration of justice."

Owens–Corning filed objections to the referee's Report and Recommendations. The trial court overruled those objections and adopted the Report and Recommendations of the referee in an order dated January 22, 1992.

According to Owens–Corning, the practical effect of the trial court's order was to not only remove Schlachter from further participation in the Summit County Tireworkers Cases, but to also inhibit his *pro hac vice* admission in other states:

"Attorney Schlachter in seeking admission *pro hac vice* must now report in other states in which his client has tireworkers cases that his privileges were revoked for misconduct in Ohio. The result of the disclosure is obvious. He will not be admitted elsewhere."

Owens–Corning appealed from the trial court's order.

## II

### A

A trial court that extends *pro hac vice* status to an out-of-state lawyer retains the power to revoke that status. In *Royal Indemn. Co. v. J.C. Penney Co.* (1986), 27 Ohio St.3d 31, 27 OBR 447, 501 N.E.2d 617, the Ohio Supreme Court stated that the power to revoke such status is part of a court's "inherent power to regulate the practice before it and protect the integrity of its proceedings." *Id.* at 33–34, 27 OBR at 449, 501 N.E.2d at 620. In *Royal Indemn.*, the Supreme Court determined that, at a minimum, conduct that would justify a trial

court in disqualifying in-state counsel from participating in a particular case, would also justify revocation of *pro hac vice* status for out-of-state counsel. *Id.* at 36, 27 OBR at 450, 501 N.E.2d at 621. The Supreme Court noted three situations that would justify a trial court in disqualifying in-state counsel from participating in a particular case:

"The most common basis for trial court disqualification of an attorney is the risk of a tainted trial due to an actual or potential conflict of interest. * * * However, this is not the only ground for disqualification. The trial court's power to protect its pending proceedings includes the authority to dismiss an attorney who cannot, or will not, take part in them with a reasonable degree of propriety. * * * Similarly, attorney disqualification can be warranted in cases of truly egregious misconduct which is likely to infect future proceedings." *Id.* at 34, 27 OBR at 449, 501 N.E.2d at 620.

Although the moving defendants argued to the referee that Schlachter's *pro hac vice* status was subject to being revoked based upon each of the three justifications listed by the Supreme Court in *Royal Indemn.*, the referee's recommendation was based only on the third justification. The moving defendants have not argued to this court that the trial court erred in failing to find either of the first two justifications present in this case. The issue before this court, therefore, is whether the trial court erred in determining that Schlachter engaged in "truly egregious misconduct" which was "likely to infect future proceedings."

### B

The foundation of the referee's recommendation that Schlachter's *pro hac vice* status should be revoked was a determination that Schlachter had not been truthful with the referee during the telephone conversations on the morning of Case's deposition. The referee determined that, rather than Case requesting Schlachter to serve as his counsel for purposes of the deposition after the first telephone conversation, Schlachter was already serving as Case's lawyer at the time of that first conversation:

"Attorney Schlachter and his firm, as of October 1, 1992, had an existing and ongoing arrangement whereby Owens Corning & Fiberglas retained the firm of Tilly & Graves to include Attorney Schlachter. Part of this relationship was to represent Dr. Case in depositions like this and otherwise defend him and serve as his private counsel. This was not a relationship wherein Owens Corning & Fiberglas and Attorney Schlachter were dealing with an expert witness retained by Owens Corning & Fiberglas, but rather they were involved in an actual lawyer-client relationship between themselves and the Doctor paid for by OCF."

The referee's finding about the relationship between Schlachter and Case was based upon two pieces of evidence. First, he relied upon Case's testimony at his deposition:

"Q. Did you ask Mr. Schlachter why he was there preparing you for a deposition you were going to be giving on behalf of the plaintiffs?

"A. Well, Mr. Schlachter wasn't there preparing me but I knew perfectly well that he was coming and we already have entered, I think, as the first exhibit a letter from him saying that he was going to be here to defend me. Of course you've managed to exclude him from the room so he isn't here."

Second, he relied upon the letter to which Case referred in the above-quoted testimony. In that letter, dated September 4, 1992, Schlachter confirmed that the deposition would be held on October 1 and 2. He then proposed meeting on September 30 to prepare for the deposition:

"In addition, it is my understanding that you are available most of the day on September 30th. It is my suggestion that we schedule the last couple of hours of the day of September 30th for preparation. Unless I hear to the contrary from you, I will plan on meeting with you at your offices at 3 p.m. on Wednesday, September 30, 1992. Please be advised that it appears that Russell Smith or one of the other Plaintiffs' attorneys will also be present at this preparation meeting on September 30th and will be present to defend you along with myself at the depositions."

The referee concluded that Owens–Corning had retained Schlachter and his firm to serve as Case's "personal counsel * * * far in advance of the statement made by attorney Schlachter on October 1, 1992, in the second phone call when he asserted he was just retained by Dr. Case to represent him."

## C

In *Royal Indemn.*, the Supreme Court stated that the determination of whether to revoke an out-of-state attorney's *pro hac vice* status is within a trial court's discretion. *Royal Indemn.*, 27 Ohio St.3d at 35, 27 OBR at 450, 501 N.E.2d at 620. In order for revocation to be appropriate, however, there must be sufficient evidence before the trial court to support a finding of conflict of interest, egregious misconduct, or another circumstance justifying the exercise of that discretion. For example, in *Royal Indemn.*, the Supreme Court stated that there was sufficient evidence before the trial court in that case to support its finding that the attorney whose *pro hac vice* status had there been revoked had purposely set out to mislead his opposing counsel about the existence of certain relevant documents. *Id.* at 36, 27 OBR at 450, 501 N.E.2d at 621.

As noted previously, the referee in this case based his finding that Schlachter was already serving as Case's counsel at the time of the first telephone conversation on October 1, 1992, on two pieces of evidence: Case's testimony and the September 4, 1992, letter. The testimony relied upon by the referee was a recitation that Schlachter had informed Case in the September 4, 1992, letter that he would be present at the deposition to "defend" him. The import of both pieces of evidence relied upon by the referee, therefore, was the same: Schlachter had informed Case in the September 4, 1992, letter that he would be present at the deposition to "defend" him. The question becomes, therefore, whether the September 4, 1992, letter was sufficient evidence to support a finding that Schlachter was serving as Case's attorney at the time of his first telephone conversation on October 1, 1992, as found by the referee.

It is not uncommon for an attorney to refer to his or her presence at a deposition being taken by another party as "defending the deposition" or "defending the witness." This is true even though the person being deposed is not that attorney's client and his or her true purpose for being present is to protect the interests of his or her client. Normally, no confusion arises from such shorthand methods of referring to an attorney's presence at a deposition of a nonparty witness. The attorney "defending the deposition" or "defending the witness" has a right to object to improper questions just as he or she has a right to object to improper questions asked a nonparty witness at trial. The attorney's action in "defending the deposition" or "defending the witness," however, does not mean that there is an attorney-client relationship between the attorney and the witness. The witness does not pay the attorney for being present nor are communications between the nonparty witness and the "defending" attorney within the attorney-client privilege.

At the time Schlachter wrote the September 4, 1992, letter, it was his belief that Case was to be deposed as part of the discovery in Groups V through XVIII. Inasmuch as Owens–Corning had not settled with one of the members of Group XIII, Schlachter would have been entitled to attend the deposition as Owens–Corning's attorney. His use of the term "defend" in the September 4, 1992, letter appears to have been in the sense that he would be present and would object to improper questions, rather than that he would be present as Case's attorney. That Schlachter used the term "defend" in this sense is supported by his also having informed Case in the same letter that one of the plaintiffs' attorneys would be present to "defend" him at the deposition as well. Nobody has suggested that Schlachter's use of the term "defend" in connection with plaintiffs' attorneys meant that he believed there was an attorney-client relationship between Case and those attorneys.

During the first telephone conversation with the referee on October 1, 1992, among other things, Schlachter noted that if the objecting defendants had concerns about discussions he might have with Case during the deposition or breaks in the deposition, they would be free to inquire regarding any such conversations:

"If there is concern about my discussions with the witness either during the deposition or during breaks, they can certainly inquire about those and put those on the record as to the extent of any such discussions."

If there had been an attorney-client relationship in existence between Schlachter and Case at the time of the first telephone conversation, communications between Schlachter and Case would have been protected by the attorney-client privilege and would not have been subject to being "put on the record" unless Case waived the privilege.

There was not sufficient evidence in the record to support the referee's finding that Schlachter was serving as Case's attorney at the time he informed the referee during the first telephone conversation on October 1, 1992, that he wished to attend the deposition as an "interested observer." Accordingly, there was not sufficient evidence to support the referee's finding that Schlachter had engaged in a "truly egregious act of professional misconduct" by "consciously, willfully, and intentionally misrepresent[ing]" his reason for wishing to attend the deposition. This lack of sufficient evidence to support the trial court's factual finding requires reversal of its judgment regardless of whether the standard for revocation of *pro hac vice* status is identical to the standard for disqualification of in-state counsel. The trial court's action was based upon a finding that Schlachter had lied to the referee and there simply was not sufficient evidence to support that finding. Accordingly, Owens–Corning's assignment of error must be sustained.

Schlachter did behave in an ill-advised manner in Montreal on October 1, 1992, particularly following the referee's ruling during the first telephone conversation that he could not attend the deposition. Of course, no explanation has been offered by the parties who have sought revocation of his *pro hac vice* status for the narrowing of the scope of the deposition after service of a notice that indicated that it was being taken for use in connection with at least one claimant with whom Owens–Corning had not settled. An inference would be possible that the deposition was narrowed from its original scope for the very purpose of preventing Owens–Corning from being represented at it. Although narrowing the scope of the deposition based on such a motive could not be termed "egregious" conduct, when it is recognized that an argument is possible pursuant to Evid.R. 804(B)(1) that testimony at that deposition could be used against Owens–Corning in other cases, it sheds a slightly different light on the shock expressed by the moving defendants regarding Schlachter's ill-advised attempt to

attend a deposition in an action in which his client was no longer a party. See *Clay v. Johns–Manville Sales Corp.* (C.A. 6, 1983), 722 F.2d 1289. It is regrettable that the resources of clients, not to mention judicial resources, are wasted dealing with collateral issues that do not advance the merits of litigation to a just resolution.

## III

The judgment of the trial court revoking Schlachter's *pro hac vice* status was not supported by sufficient evidence. Accordingly, the judgment of the trial court is reversed and this matter is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

REECE, J., concurs.

COOK, P.J., dissents.

COOK, Presiding Judge, dissenting.

Because the Ohio Supreme Court holds that unless a trial court abuses its discretion in such matters, its judgment should not be disturbed, I respectfully dissent. The trial court must be shown to have acted unreasonably, capriciously, or arbitrarily. In that no such showing has been made, I remain unconvinced that the judgment should be reversed.