984 P.2d 1198

**BANK OF HAWAII, a Hawai'i banking corporation, Plaintiff–Appellee,**

v.

**Allan Ryo KUNIMOTO, aka Allan R. Kunimoto, Allan R. Kunimoto, as Trustee of that certain unrecorded Allan R. Kunimoto Revocable Trust Agreement dated February 19, 1981, as amended, Living Designs, Inc., a Hawai'i corporation, John Does 1–10, Doe Partnerships, Corporations or Other Entities 1–20, Defendants, and A. Barry Cappello and James L. Hudgens, Parties–in–Interest/Appellants.**

No. 20575.

Supreme Court of Hawai'i.

Aug. 30, 1999.

Reconsideration Denied
Oct. 9, 1999.

Kelvin H. Kaneshiro, Honolulu, (Dennis E.W. O'Connor with him on the briefs) of Reinwald, O'Connor & Playdon for Parties–In–Interest/Appellants.

A. Barry Cappello and James L. Hudgens, Katherine G. Leonard, Honolulu (Nenad Krek with her on the brief) of Carlsmith Ball Wichman Case & Ichiki for Plaintiff–Appellee Bank of Hawaii.

MOON, C.J., KLEIN, LEVINSON, NAKAYAMA, and RAMIL, JJ.

Opinion of the Court by RAMIL, J.

Parties-in-interest/appellants A. Barry Cappello (Cappello) and James L. Hudgens (Hudgens) (collectively appellants), *pro hac vice* counsel for defendant Allan R. Kunimoto, M.D. (Dr. Kunimoto) in a mortgage foreclosure action filed by plaintiff-appellee Bank of Hawaii (BOH) on April 23, 1993, appeal from the first circuit court's order, filed on December 24, 1996, granting BOH's motion for an order to show cause why Dr. Kunimoto, Cappello, and Hudgens should not be held in contempt of court. In the December 24, 1996 order, the circuit court revoked the *pro hac vice* status of both Cappello and Hudgens, required appellants to disgorge funds resulting from the sale of certain Central Pacific Bank, Inc. (CPB) stock, and ordered appellants to reveal in any future *pro hac vice* application in Hawai'i that their status was revoked in the instant case and the reasons therefor.

Appellants contend that the trial court erred in: (1) revoking appellants' *pro hac vice* status and requiring future notice of said revocation, because (a) appellants were denied due process and (b) "there was no evidence to justify such a serious sanction"; and (2) ordering appellants to disgorge funds obtained from the sale of CPB stock, because the trial court was without jurisdiction to determine the ownership rights of Yoshio Kunimoto, the father of Dr. Kunimoto and a non-party to the underlying action.[1] Be-

---

1. Appellants also contend that the trial court erred in denying their motion for reconsideration, filed January 3, 1997, without a hearing. The Hawai'i Rules of Civil Procedure (HRCP) and the Rules of the Circuit Courts of the State of Hawaii (RCCH) do not expressly afford a party the right to file a motion for reconsideration. *Cf.* Hawai'i Rules of Appellate Procedure (HRAP) Rule 40(a); Hawai'i Family Court Rules (HFCR) Rules 59(b). Hawai'i appellate courts, however, have recognized that a "motion for reconsideration" can be filed pursuant to HRCP Rule 59(e) (motion to alter or amend judgment) or HRCP Rule 60 (motion for relief from judgment or order). *See K.M. Young & Assocs. v. Cieslik,* 4 Haw.App. 657, 666, 675 P.2d 793, 800 (1983), *reconsideration denied,* 5 Haw.App. 683, 753 P.2d 253 (1984); *Professional Sponsoring Fund, Inc. v. Rao,* 5 Haw.App. 382, 384, 694 P.2d 885, 886–87 (1985); *Simpson v. Department of Land & Natural Resources,* 8 Haw.App. 16, 21, 791 P.2d 1267, 1271 (1990). Hawai'i appellate courts, nevertheless, have *never* recognized a right to a hearing

cause the circuit court did not abuse its discretion, we affirm.

## I. BACKGROUND

In order to review the basis for the circuit court's order, it is necessary to detail the complex and labored history of both the underlying case and the sanctions proceedings. The following factual background, therefore, is necessarily long.

### A. The Mortgage Foreclosure Action

BOH filed a mortgage foreclosure complaint on April 23, 1993 against Dr. Kunimoto, individually and as Trustee, as well as Dr. Kunimoto's corporation, Living Designs, Inc. (collectively "Dr. Kunimoto"), when Dr. Kunimoto defaulted on two bank loans and related security interests. BOH sought (1) the total amount due and an order and interlocutory decree of foreclosure, (2) an order and interlocutory decree for the sale of security, and (3) deficiency judgments. On May 27, 1993, Dr. Kunimoto filed a two-count counterclaim seeking an accounting of certain sale proceeds and of the outstanding balance on all loans.

On November 5, 1993, BOH moved for summary judgment and an interlocutory decree of foreclosure. Dr. Kunimoto did not oppose the motion. On January 18, 1994, the circuit court granted the motion, issuing findings of fact (FOFs) and conclusions of law (COLs). An order approving the commissioner's report, confirming the commission-er's sale of certain real property at public auction, and directing distribution of the proceeds was entered on May 6, 1994 and amended on May 17, 1994. On June 1, 1994, BOH moved for deficiency judgments, and, on June 6, 1994, Dr. Kunimoto objected to BOH's exercising its option to accelerate the indebtedness.[2] Deficiency judgments in the amount of $1,699,577.30 were entered on July 5, 1994, in favor of BOH and against Dr. Kunimoto.

Dr. Kunimoto appealed to this court on August 4, 1994. On November 1, 1994, this court dismissed the appeal on the ground that Dr. Kunimoto's counterclaim had not been resolved. Thereafter, BOH moved for clarification of the circuit court's order to reflect resolution of Dr. Kunimoto's counterclaim on February 13, 1995. On May 25, 1995, Dr. Kunimoto, through a newly-hired attorney, Gregg Young, filed an application on behalf of Cappello and Hudgens to appear *pro hac vice*, pursuant to Rules of the Supreme Court of the State of Hawai'i (RSCH) Rule 1.9 (1993).[3] Because of the unnecessary delay that would be caused in granting the application and continuing the hearing on BOH's motion to clarify, appellants' first application was denied without prejudice at a hearing in mid-June 1995.[4] On June 23, 1995, the circuit court granted BOH's motion to clarify and entered final judgment against Dr. Kunimoto, who timely appealed.[5] On December 12, 1995, Dr. Kunimoto, through

on a motion for reconsideration before the circuit courts. Insofar as a denial of a motion for reconsideration is within the sound discretion of the trial court, *see Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 114, 839 P.2d 10, 26–27, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992), appellants' third point of error is meritless.

2. This was addressed in *Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 427, 984 P.2d 1253 (App.1997) (finality of decision stayed pending bankruptcy and disposition of motion for reconsideration under HRAP Rule 41(a)).

3. RSCH Rule 1.9 provides in relevant part:

Any attorney actively licensed to practice law by the highest court of a state ... of the United States ... who is not a resident of Hawaii may be permitted to associate himself or herself with a member or members of the Hawaii bar in the presentation of a specific case at the discretion of the presiding judge or judges.

4. The record reflects that the only time Cappello appeared in this case was at the hearing on the initial application, held on June 14, 1995.

5. As noted previously, Dr. Kunimoto's second appeal culminated in a published opinion by the Intermediate Court of Appeals. *See Bank of Hawai'i v. Kunimoto*, 91 Hawai'i 427, 984 P.2d

Young, filed a second application for *pro hac vice* status for Cappello and Hudgens. On December 28, 1995, the circuit court granted the *pro hac vice* application of Cappello and Hudgens, on the conditions that: (1) "there shall be meaningful participation by local counsel"; (2) "service shall be on local counsel"; and (3) "local counsel shall at all times remain lead counsel."

Meanwhile, BOH's attempts to collect the $1.6 million were ongoing and apparently unsuccessful. On November 20, 1995, BOH moved for a temporary restraining order (TRO) to prevent Dr. Kunimoto (1) from requesting to be paid to or accepting payments, namely from Hawaii Medical Services Association, through a sham corporation established to receive income on behalf of his ophthalmology practice and (2) from fraudulently transferring his medical practice. BOH attached to the motion a copy of findings of fact and conclusions of law filed by the United States Bankruptcy Court for the District of Hawaii on August 21, 1995, in *In re Clark Emerson Venture, Inc.*, Case No. 92–01388 (chapter 11). Therein, the Bankruptcy Court expressly (1) found that Dr. Kunimoto had made false and misleading representations in his disclosure statements and related filings before the bankruptcy court and (2) concluded that Dr. Kunimoto had committed a fraud upon the bankruptcy court.

On December 1, 1995, BOH also moved for the appointment of an independent receiver to aid in the execution of the deficiency judgments. In its motion, BOH again detailed attempts by Dr. Kunimoto fraudulently to transfer his medical practice, as well as Dr. Kunimoto's suspected concealment of stocks. At a December 12, 1995 hearing, the circuit court stated:

> In July 1995, the plaintiff, Bank of Hawaii, obtained a deficiency judgment in excess of $1.6 million against defendant Allan Kunimoto. Defendant Kunimoto is a practicing ophthalmologist and eye surgeon. In April, 1995, the defendant advised the Hawaii Medical Services Association that he had incorporated his medical business and requested that payments be made to capital A.R.K. Eye Care, Inc.

> Thereafter, H.M.S.A. made payments to the corporate entity identified by the defendant. In fact, A.R.K. Eye Care, Inc. was not properly formed at the time and was not registered with the State Department of Commerce and Consumer Affairs. Additionally, while the defendant denied receiving monies from H.M.S.A., records obtained from H.M.S.A. indicate clearly, that substantial payments were made to him [in] 1995.

> Further, the defendant's wife formed a second corporation named ... J.M.K. Services, Inc. on November 7th, 1995, which sought to receive funds from H.M.S.A. *The circumstances surrounding the formation of A.R.K. Eye Care, Inc. and J.M.K. Services, Inc., and the communications with H.M.S.A. are, at best, suspicious to the court.*

> Finally, a federal bankruptcy judge found and concluded in August, 1995, that defendant Kunimoto had perpetrated a fraud on the U.S. Bankruptcy Court in the case entitled [*In re Clark Emerson Venture, Inc.*], Case Number 92–01388.

> Further and finally, based on the evidence, the court has serious doubts about defendant Kunimoto's credibility as a witness.

> The court further finds and concludes as follows.

> First, *it appears to the court* that plaintiffs will probably prevail on the merits of their claims; *that defendant Kunimoto has and would in the future probably engage in conduct or transfers which would violate or be in violation of Hawaii Revised Statutes Chapter 651C.*[6] *The court is very concerned that defendant Kunimoto would dispose of income or assets without any payment to the plaintiff.*

> Second and most importantly, the harm or damage resulting to the plaintiff is se-

1253 (App.1997) (finality of decision stayed pending bankruptcy and disposition of motion for reconsideration under HRAP Rule 41(a)).

6. HRS Chapter 651C (1993) is Hawaii's Uniform Fraudulent Transfer Act.

vere, immediate, and irreparable. *The court believes and finds that the defendant continues to hinder, delay, or defraud the plaintiff by engaging in conduct which is in violation of Hawaii Revised Statutes, Chapter 651C. Defendant's conduct, an example of which is described in federal bankruptcy Judge King's findings of fact and conclusions of law and order, should not be tolerated.*

Finally, the public interest would arguably be served by the issuance of a temporary restraining order in this case. Judgment debtors should not lie, deceive, or attempt to manipulate the legal system to avoid paying monies which are owed to a creditor.

. . . .

In addition[, . . . ] *the court further finds that defendant Allan Kunimoto has made misrepresentations of material fact and engaged in a course of conduct designed to hinder and delay the plaintiff's collection efforts and that without the appointment of a receiver, the court believes that he would continue in his willful course of conduct and frustrate the plaintiff's efforts to account for and collect on its outstanding . . . judgment.*

(Emphases, footnote, and brackets added.) On December 20, 1995, the circuit court formally granted BOH's motion to appoint a receiver and specifically incorporated by reference the findings of fact and conclusions of law entered on BOH's motion for a TRO, *i.e.,* the above facts and conclusions entered orally at the December 12, 1995 hearing. More importantly, the circuit court granted the receiver power to "locate and to take possession and control of Kunimoto's stock certificates [and] . . . to cause reissuance of such stock certificates[.]" Jay M. Fidell, Esq. was appointed Receiver in Aid of Execution of Judgment ("receiver") on December 21, 1995. On December 27, 1995, BOH next moved for a preliminary injunction because of Dr. Kunimoto's continued failure to comply with court orders regarding the discovery of his assets. The receiver's first and second reports, dated February 20, 1996 and March 20, 1996, indicate Kunimoto's continued efforts to thwart BOH's collection on the deficiency judgments.

As early as October 1995, it was apparent that Dr. Kunimoto was attempting to conceal his ownership in certain stocks. On October 9, 1995, the circuit court granted BOH's motion to compel Dr. Kunimoto to produce all records in his possession. However, Dr. Kunimoto failed to produce any stock certificates at a continued judgment debtor examination held on October 21, 1995. On October 31, 1995, Dr. Kunimoto, via letter by Stephen Tom, Esq. on behalf of Young, informed BOH that certain stock certificates had not yet been located and that Dr. Kunimoto would search for them upon his return from Atlanta, Georgia on business. On November 4, 1995 and January 9, 1996, Dr. Kunimoto reported that he was unable to locate any of the CPB stock certificates.

The receiver, however, determined on or about February 9, 1996, that Dr. Kunimoto was the registered owner of 5,406 common shares of CPB stock. At that time, there was no indication from Chemical Mellon, the transfer agent and stock registrar for CPB stock, that the stock had ever been transferred from Dr. Kunimoto to anyone. In order to account for the CPB stock, the receiver then requested from Chemical Mellon reissuance forms for duplicate stock certificates and provided the reissuance forms to Dr. Kunimoto on March 12, 1996. When Dr. Kunimoto failed to respond, the receiver moved the circuit court, on March 21, 1996, to order Dr. Kunimoto to sign the replacement stock certificate forms. On April 19, 1996, the circuit court orally ordered Kunimoto to comply with the receiver's requests or face a sanction of $200.00 per day. The order was entered May 17, 1996, specifically ordering Dr. Kunimoto "to sign the replacement stock application previously provided to Dr. Kunimoto regarding shares of CPB, Inc. stock[.]"

Because of further noncompliance by Dr. Kunimoto, the receiver moved for instruc-

tions from the circuit court on June 25, 1996. In said motion, the receiver explained that Dr. Kunimoto finally returned the stock reissuance forms but altered them to indicate that his father was the "equitable" owner. The receiver submitted the forms to Chemical Mellon, which rejected them because Dr. Kunimoto was, in fact, the sole owner of record. When the receiver requested that Dr. Kunimoto properly complete the forms, as the sole owner of the stock, he responded by claiming that his sister, Gail Y. Kunimoto, had found certificates for 2,948 shares and by altering the reissuance application forms, again, this time stating that he only owned thirty-one percent of the remaining shares of CPB stock.[7] At the hearing on the receiver's motion, on June 28, 1996, Young stated that Dr. Kunimoto only owned twenty-five percent of the CPB stock and Yoshio Kunimoto owned the remaining seventy-five percent.

On July 23, 1996, Dr. Kunimoto testified that he had assigned to his father 2,948 shares of the same CPB stock on February 2 and 28, 1989. The assignment was allegedly witnessed by Dr. Kunimoto's sister. Dr. Kunimoto explained that, over one month previously, on June 13, 1996, Yoshio Kunimoto assigned the same 2,948 shares of CPB stock to the California law firm of Cappello and McCann (the law firm of defendants' *pro hac vice* counsel, Cappello and Hudgens), as payment for attorneys' fees and expenses. According to Dr. Kunimoto, on June 14, 1996, he caused his wife to deliver the same 2,948 shares of CPB stock to Cappello and McCann.[8] At the July 23, 1996 hearing, the circuit court stated:

We, this morning, have gone through an extraordinary event of having to call Dr.

Kunimoto's father and sister here to testify because of a dispute with regards to this CPB stock. . . .

It is [of] some concern to the Court that now having gone through at least two hearings concerning this stock, that there may be an issue that at least some of these stocks or stock certificates which were the subject of discovery requests and at least directly or indirectly the subject of this hearing this morning, may have been transferred or delivered to your co-counsel while this entire discovery dispute was ongoing.

And I don't know if you know anything about it or not, but it is of concern to me, because if that is the case, and we've gone through at least two hearings now only to discover that some of the information and documents which were the subject of plaintiff's discovery request and the Court's further hearing on this could have been addressed or produced earlier, and were in fact in the possession of your co-counsel, that is of concern to me.

And I'm not in any way saying or suggesting that you were a part of this, because you've indicated that you weren't, and the Court accepts that. But it is of some concern to me, because, frankly, these attorneys are admitted pro hac vice, and one of the things that all lawyers who are admitted pro hac vice must do is comply with all of the local rules and statutes, and certainly act in a professional way and not in a way that somehow is a fraud upon the Court.

So this is what I'm going to do, Mr. Young. I'm going to direct you to speak with your co-counsel, and I'm going to order them to produce copies of these subject stock certificates which were apparently delivered by or on behalf of Dr.

7. *See* Receiver's Motion for Instructions Regarding Continuation of Receivership, filed June 25, 1996, at 2.

8. On July 26, 1996, Dr. Kunimoto submitted a report to the circuit court detailing the alleged assignment to his father and from his father to the Cappello and McCann law firm. Dr. Kuni-

moto averred that he "was told that [he] could use [his] dad's CPB, Inc. Stocks" to pay his attorneys' fees and that his "local attorney, Mr. Gregg Young, was not informed regarding the above Stock Certificates assignment/transfer nor the delivery of the Stock Certificates to Cappello & McCann."

Kunimoto to the Cappello and McCann law firm, and copies of any other relevant documents regarding any transfer or sale of any interest in those shares of stock, the CPB stock, to my chambers by the close of business this Friday, the 26th. And depending upon what they produce or what information becomes available, then the Court will decide whether or not any further action is warranted. But I think at a minimum, this is what you should do, Mr. Young.

On July 29, 1996, BOH filed a motion for an order to show cause why Dr. Kunimoto, Cappello, and Hudgens should not be held in contempt of court "for their intentional [and flagrant] disobedience to the letter and the spirit of the orders and other processes of this Court." The first of several contempt hearings was held on July 31, 1996.

B. *The Contempt Hearings*

Hudgens appeared with Dr. Kunimoto at the first contempt hearing on July 31, 1996. The following transpired:

> The Court: Mr. Young, at the end of June at the hearing, the Court went through the extraordinary effort of giving your client a chance to basically come clean on this issue. As a last resort, the Court told you and your client that I would hear testimony from your client's father, your client's sister. These are not people to this lawsuit.

> You had this Court go through an entire evidentiary hearing, when at least your client knew all along and at the time of that hearing at the end of June what the true status of that stock was. I don't care what you say, but that fact is uncontrovertible. You agree with me?

> Mr. Young: Yeah, I agree.

> . . . .

> The Court: *Now, Mr. Hudgens, I admitted you pro hac vice, you and Mr. Cappello, isn't that right?*

Mr. Hudgens: Yes, we are pro hac vice.

> The Court: And I admitted you?

> Mr. Hudgens: I believe that is correct, Your Honor.

> The Court: *So I have the power to revoke it?*

> Mr. Hudgens: That is correct, Your Honor.

> The Court: All right. Go ahead.

> Mr. Hudgens: Your Honor, f[ir]m Cappello & McCann in no way intended or intends to show any kind of contempt or disobedience to any court order. It has been our understanding that the stock that is at issue here is the stock of Dr. Kunimoto's father, and has been the stock of his father for at least seven years, or close to seven years. And it's our understanding that the transfer of that stock from Yoshio Kunimoto to Cappello & McCann was done to help his son assist him in the payment of legal fees, and that the order of the Court did not apply to that specific stock; that the Receiver was attempting to retrieve stock that was owned by Dr. Kunimoto.

> As the Court point[ed] out, Yoshio Kunimoto is not a party to this action.

> Dr. Kunimoto has signed documentation that he believes accurately represents the ownership of that stock. He transferred the stock in 1989. They couldn't find the stock certificates, apparently, and when they did finally find them, they immediately notified the Receiver of that. There was no effort to try and hold that back from the Receiver.

> . . . .

> The Court: I tend to sort of try to see the forest and not only just the trees in front of my face Mr. Hudgens. As you know, this whole case since it's been before me has surrounded or been involved with basically, identifying assets that Dr. Kunimoto has. And you would agree with that, wouldn't you?

Mr. Hudgens: I agree that that is in receivership, yes, Your Honor.

The Court: And you'd agree with me that the Receiver is an agent of the Court?

Mr. Hudgens: That's correct.

The Court: All right. And you've seen the order appointing the Receiver that I issued back in December of 1995?

Mr. Hudgens: *I'm sure I have, Your Honor.*

The Court: It authorizes the Receiver to go ahead and identify all of the stocks that Dr. Kunimoto has or may have had.

Mr. Hudgens: *That's correct, that it appoints him to look at all the stocks.*

The Court: And I guess, you know, Mr. Hudgens, I guess the difficulty I have, and I've had your partner Mr. Cappello in my courtroom and I've qualified him as an expert so I know your reputation and your firm's reputation, and I guess that's why I'm really surprised at this turn of events, *because what I see going on,* at least based on what has been submitted to me, *is that there's some real fast and loose maneuvering going on here with the Court. And at least there's been an effort, conscious or reckless, to try and interpret the meanings of the court's orders so that it best suits a particular party. Now, whether that's advocacy, I'm not sure. Whether that's unprofessional, whether it's unethical, I'm not sure because I don't have the complete record.*

But I do know that for at least the last six months, this court's been trying to identify all of the stock certificates owned, claimed to be owned, at one time owned by Dr. Kunimoto. And that was why this Court went to the extreme effort of requiring Dr. Kunimoto to have his father and sister here.

But at the same time, Mr. Hudgens, the Court expressly told Mr. Young that he could have avoided all of that by providing the information before then. And in fact, the Court gave him ample opportunity to do that.

That's what the problem is here, that—and I will grant you that you haven't been here for all of those hearings, *but you are co-counsel of record and I'm presuming that Mr. Young has kept you fully informed, as he should, under the pro hac vice.*

Mr. Hudgens: *Your Honor, I was not in any way trying to exculpate myself by saying I was not at those hearings.*

. . . .

Mr. Hudgens: Your Honor, we—I certainly understand the Court's deep concern with this issue, and I regret that it has gotten to this point. We certainly have meant and mean absolutely no disrespect to the court or this court's order. . . . Our only concern has been to attempt to provide a defense to Dr. Kunimoto. And we sincerely believe that those share certificates were not certificates that were owned by Dr. Kunimoto. I still believe that they are not owned by Dr. Kunimoto. And it was my understanding from what I have seen that that was clear from the paper work that has been provided to the Receiver.

The Court: You know, that may be the case Mr. Hudgens. . . . *I think it's been clear that the Receiver has, at least over the past few months, told Mr. Young, and presumably through Dr. Kunimoto, that this is not a question about ownership. It is a question of simply producing information and documents. That the question of ownership can be something that's going to be litigated in the future.*

So, ... I understand what you're saying about your good faith belief in the ownership. But that's not really the issue here. *The issue is whether or not somebody has in good faith complied with the court's orders or not complied with them, or certainly not complied with the spirit of the court's orders.*

. . . .

The Court: The Court is going to schedule a further hearing on this matter at 8:30 on Thursday, August the 15th.

*If either counsel want to submit any additional memorandum or other briefs, it should be done by the close of business on Tuesday, August the 13th. And the Court will review it.*

*Mr. Hudgens, I think what you need to understand is that even though I may not hold you in contempt, or Mr. Young, or Dr. Kunimoto in contempt, I, nevertheless, have some serious concerns about the pro hac vice that I originally granted you in this case. So I would urge you to address that particular issue if you're going to submit any memorandum to the Court.*

Mr. Hudgens: I would do that, Your Honor.

(Emphases added.) The August 13, 1996 hearing date was continued to September 6, 1996, to October 11, 1996, and, finally, to Friday, October 18, 1996.

On October 18, 1996, Hudgens and Cappello did not appear. Young moved for a continuance on the basis of their absence. Young explained that Hudgens had finished a trial on the previous Monday, was beginning another trial on the following Monday, and was in depositions all day, and that Cappello "planned a vacation after that trial, and it was four to six months in advance, a safari to Africa." The circuit court stated:

Mr. Young, do you have any idea what position Mr. Hudgens and Mr. Cap[p]ello have put you and Dr. Kunimoto in because of their conduct?

You know, I appreciate, Mr. Young that you've expressed your apologies to the Court; and to a certain extent you've tried to shoulder some of the responsibility for this. But, frankly, I don't think the blame falls squarely on your shoulders. It is incredible to me that Mr. Cap[p]ello who has appeared as an expert witness before this court in another case has the temerity to not show up at a hearing that he's known about for literally months because he wants to go on a vacation.

. . . .

The previous continuances were premised upon the fact that Mr. Hudgens and Mr. Cap[p]ello were engaged in trial on the Mainland. And those kinds of things happen. And I think Ms. Leonard understands that, and the Court understands that. And we've tried to accommodate their schedules. It is a little troubling to me with regards to Mr. Hudgens that his trial completes on Monday; he doesn't start another one until the following Monday. And, yes, he probably has depositions to complete in the upcoming trial. But, admittedly, he could have flown here and flown back and still had the weekend to prepare.

Mr. Cap[p]ello is a totally different story. I mean basically how I look at it is he's [th]um[b]ling his nose at the Court. He's the one who wanted to practice pro hac vice before this Court. I mean maybe he doesn't view this as a very serious thing, but I'll tell you, I view this very serious[ly].

. . . .

*Well, I think there are some serious due process considerations here without Mr. Cap[p]ello and Mr. Hudgens to defend themselves in the event that I do find them in contempt and whatever sanctions, penalties, or punishment I impose. And be-*

*cause of that, I don't think I have much choice but to grant the continuance on this case.*

*. . . .*

All right. I will reschedule this motion for hearing November 22[, 1996]. . . . *And I am specifically ordering Mr. Hudgens to be here, Mr. Young; I'm also specifically ordering Mr. Cap[p]ello to be here. Now, I understand that he's out of the country, but if he's back in the country before that, he's ordered to be here—no if's, and's, or but's or any other excuses.*

*If neither of these gentlemen show up, then we'll decide the motion. I will issue my ruling, and if they are found in contempt, I'll issue a sanction at that time. All right.*

(Emphases and brackets added.) Prior to the November 22, 1996 hearing, a supplemental memorandum in opposition was filed by Young, Cappello, and Hudgens, on November 20, 1996. In their motion, appellants stated that, prior to receiving the CPB stock certificates from Yoshio Kunimoto, they

*examined the orders of [the circuit c]ourt appointing the Receiver and relative to the Receiver which were maintained in Cappello & McCann's files to ascertain whether there was any order which would preclude accepting payment of fees from Dr. Kunimoto's father.* . . . Unfortunately, Cappello & McCann did not have copies of any of the correspondence to and from the Receiver in this action relating to the CPB shares. Counsel was certainly aware that Dr. Kunimoto was prohibited from transferring any shares of stock owned by him, (CPB or other stock) to counsel or anyone else. Counsel was not, however, aware that the specific shares of CPB stock owned by Yoshio Kunimoto had become an issue with the Receiver. Further, counsel was completely unaware that any issue had been raised with respect to the Receiver's claims for possession of these shares[.]

It was not until on or about July 23, 1996 that Cappello & McCann learned for the first time that the Receiver was claiming right to possession of the shares of stock owned by Yoshio Kunimoto. Cappello & McCann also first learned at that time that the ownership of that stock was even an issue. Cappello & McCann had not been directly involved in the Receivership proceedings which were primarily handled by local counsel. Because it was unaware of the pendency of these issues prior to late July, Cappello & McCann had arranged for the sale and sold the CPB shares.

Since learning of the dispute over ownership of the CPB shares, and the Court's concerns over transfer of these shares to Cappello & McCann, the proceeds from the sale of these shares have been maintained by Cappello & McCann and pursuant to this Court's order of October 18, 1996, those funds were frozen in place. *The funds have only now been accessed to provide a Cashier's Check for the entire proceeds which counsel will bring to the hearing on November 22, 1996 for submission to the Court pending a hearing on Yoshio Kunimoto's ownership.*

Cappello & McCann did not and would not knowingly take any action which would be disrespectful of or, in contempt of any order of this Court. Having now seen the correspondence to and from the Receiver concerning the CPB stock, counsel fully appreciates the Court's concerns and position relative to that stock. *Counsel can only reiterate that had it been aware of the issues related to the stock, i[t] would not have accepted the stock without court approval.*

(Emphases added.)

On November 22, 1996, Hudgens appeared, but Cappello did not. According to Hudgens, Cappello was back in the country but was "still on his honeymoon." The following transpired:

Mr. Hudgens: Morning, Your Honor.

Your Honor, I'm a partner in Cap[p]ello McCan[n] and I'm very upset at the allegations that attack the integrity of my firm as is Mr. Cap[p]ello very upset and as are each of our partners.

What the Bank is doing is attempting to destroy Dr. Kunimoto. They're not simply trying to collect on some alleged debt. They're not simply trying to avoid liability on a claim. They're seeking to try and destroy Dr. Kunimoto.

. . . .

*Now we are counsel of record. There's no dispute about that.* Our focus, however, has been the lender liability issues, and the receivership issues have been largely dealt with by primary counsel Mr. Young. What we have in our papers is absolutely true, Your Honor. We had no knowledge that these shares of stock were in any way in issue. When these shares of stock were presented to the firm—

The Court: *I'd like to know, Mr. Hudgens, as pro hac vice counsel what you think your obligations and duty are to that Court in which you appear with pro hac vice status.*

Mr. Hudgens: *Our obligations to the Court are no different as pro hac vice than they are in any other court we appear. We are an officer of the Court and we have a duty to be honest, straightforward with the Court and represent our client.*

The Court: *What duty do you have with regards to the knowledge of the status of the proceedings that occur in the case that you're allowed pro hac vice?*

Mr. Hudgens: *Your Honor, we are charged with the status of—of knowledge of the status of the proceedings;* however, when we—when we received this stock, we were not aware of any court order of the Court directly dealing with these shares of stock. *What we looked at were orders of the Court appointing the receiver. . . .* There is no prohibition in there. . . .

The Court: Mr. Hudgens, you're looking at a tree, not a forest. I'm looking at the forest.

Mr. Hudgens: *I understand Your Honor's concern here. We're not—the issue is not the ownership of that stock.* I recognize that is not what the Court's focus is. However, the Court's focus is the knowledge of Cap[p]ello and McCan[n] and Dr. Kunimoto at the time, and our knowledge at that time was that these shares of stock were Dr. Kunimoto's father's shares of stock. I still believe that to be true, but that's not the issue. The issue is that's what we believed when we received these stocks. *We looked at the face of them. They showed a transfer in 1989. Our client gave us those stocks with that legend on it, with that transfer on it, and we believe that to be a valid transfer.* That coupled with there being no reason why a family member could not pay those fees, we believe that to be a proper acceptance.

. . . .

The Court: *Let me ask you this, Mr. Hudgens. Did you know that the Court had gone to the extraordinary step of requiring Dr. Kunimoto's father to appear and answer questions under oath?*

Mr. Hudgens: *Yes, I was aware of that, Your Honor.*

The Court: *All right. Then when you knew that, then you knew that the subject of the questioning was the CPB stock.*

Mr. Hudgens: Your Honor, our understanding of that was the CPB stock—there are five shares—five certificates of CPB stock.... My understanding of that at the time was that those shares of stock the Court was questioning related to the three shares of stock which Dr. Kunimoto had signed on the application prepared for him by the receiver and had crossed out the ownership of it and had put in that he only owned a portion of it and his father owned shares. That, I believe, was the focus....

....

The Court: All right. *Well, then, Mr. Hudgens, I'm sure that you must have looked at the December 1995 order that I issued with regards to the receivership; correct?*

Mr. Hudgens: I have looked at ... your orders, Your Honor.

The Court: *And what does that order say with regards to stock, assets, and so forth with regards to Dr. Kunimoto?*

Mr. Hudgens: *That the receiver is empowered to investigate and to marshall stock.*

The Court: *All stock. All assets.*

Mr. Hudgens: *That's correct, Your Honor....*

Ms. Leonard: ....
Your Honor, it's just hard to believe that nobody knew that this stock was at issue. You know. Dr. Kunimoto knew. He absolutely knew because when the—on May 31st[, 1996] the copies of the share go to the receiver, the certificates go to California. He asked for a meeting. He puts it off. The timing is just not coincidental. There really ought to be consequences for this, Your Honor.

....

The Court: With regards to the Plaintiff Bank of Hawaii's motion for order to show cause why Allan R. Kunimoto, A. Barry Cap[p]ello, and James L. Hudgens should not be held in contempt of court, the Court states the following:

> As pro hac vice counsel, Messers Hudgens and Cap[p]ello and the Cap[p]ello and McCan[n] law firm are bound to comply with the orders issued by this court and to be knowledgeable of all proceedings in this case.

It is abundantly clear that the issue of locating the CPB, Inc., stock has been the subject of proceedings before this Court beginning as early as April 19, 1996.

On or about June 14, 1996[,] Mrs. Jean Kunimoto delivered the stock certificates for 2,948 shares of CPB stock to the Cap[p]ello and McCan[n] law firm in California. Thereafter the Cap[p]ello law firm delivered those stock certificates for liquidation on or about June 25, 1996.

On June 28, 1996[,] there is a hearing on the receiver's motion for instructions regarding, among other items, the CPB stock. Because of the unresolved dispute[,] Court did the extraordinary and directed Dr. Kunimoto's sister and father to appear and answer questions under oath regarding the ownership and location of the stock, specifically the CPB stock. The Court further directed the Kunimotos, Dr. Kunimoto, his sister, and his father, to bring with them the certificates and all documents relating to the CPB stock certificates.

On July 1, 1996[,] the Cap[p]ello law firm sent a fax to Dr. Kunimoto indicating a need for additional signatures by Dr. Kunimoto and his father to transfer the stock.

On July 5 the Cap[p]ello law firm communicated with its broker with the

direction to liquidate the CPB, Inc., stock as soon as possible. Thereafter on July 19, 1996 the Cap[p]ello law firm received $90,247.50 which represented the sale proceeds of the CPB stock.

Five days later[,] on July 23, 1996[,] a court hearing was held at which time Dr. Kunimoto, his father, and his sister, were questioned with regards to the CPB stock. It was at that time that it was disclosed to the Court that the CPB stock had been transferred to pro hac vice for the first time.

At the close of that hearing[,] the Court directed counsel to produce copies of the stock certificates, documents, and an explanation with regards to the CPB stock.

On July 29, 1996[,] the Court issued its order to show cause in this case.

The Court specifically finds that the conduct of pro hac vice counsel in this case is reprehensible. *Pro hac vice counsel knew or should have known that the location and ownership of the CPB, Inc., stock was an issue in this case as early as April 19, 1996.*

Significantly pro hac vice counsel had the stock certificates in their possession on June 14, 1996 and first attempted to liquidate the stock on June 25, 1996. At the time that pro hac vice counsel attempted to sell the stock for the first time, they knew or should have known that hearing was scheduled on June 28, 1996 to specifically address the issue or one of the issues with regards to CPB stock, and again it was at that June 28, 1996 hearing that the Court went to the extraordinary measure of requiring the Defendant's sister and father to appear and answer questions under oath regarding the CPB stock. The Court took no pleasure in having to order the Defendant's sister and father to appear and answer questions with regards to that stock. They are not parties to this action.

The hearing took place on July 23, 1996 and significantly the Court had given counsel an opportunity to eliminate or avoid the court hearing and the questioning under oath of family members if information and documents regarding CPB stock had been produced beforehand. Instead[,] pro hac vice counsel in this case went ahead, acquired additional signatures needed to dispose of the stock from the Defendant and his father, and then proceeded before July 23, 1996 hearing when the Defendant's sister and father appeared pursuant to Court directive.

Significantly[,] counsel did not disclose the fact that the CPB stock had already been sold[,] and the proceeds already obtained by pro hac vice counsel at the July 23, 1996 court hearing. It was only in the questioning of Dr. Kunimoto's father on July 23rd and thereafter the Court's verbal order issued on July 23rd and then the order to show cause issued on July 29th which prompted pro hac vice counsel to come forward and be forthcoming about the possession, handling, sale, and retention of the proceeds of the CPB stock.

Based on the foregoing[,] the Court specifically finds the following: One. *The conduct of Dr. Kunimoto and his pro hac vice counsel regarding the CPB, Inc., stock constitutes a fraud on this Court.*

Two. *At best the conduct of Dr. Kunimoto and his pro hac vice counsel was reckless; at worst it was knowing and intentional.*

Three. *Defendant['s] . . . pro hac vice counsel recklessly or knowingly deceived the Court, withheld material, responsive information and documents re-*

*garding the CPB stock, and recklessly or knowingly disregarded, if not the letter, then certainly the spirit of Court orders and Court proceedings regarding the CPB stock.*

The conduct—four. The conduct of Defendant and pro hac vice counsel in this case warrants the imposition of severe sanctions. These sanctions are as follows:

One. The Cap[p]ello and McCan[n] law firm shall immediately disgorge the total proceeds of the sale of the CPB, Inc., stock[, $90,247.50,] to the receiver. [Notwithstanding this sanction, t]he Court notes that ownership of the stock and entitlement to the proceeds of the sale of the CPB stock is still an issue and shall be determined at a later date.

Two. The pro hac vice status of the Cap[p]ello and McCan[n] law firm is revoked. This revocation is effective immediately.

Three. In the future the Cap[p]ello and McCan[n] law firm and Mr. Cap[p]ello and Mr. Hudgens shall disclose in any future application to appear pro hac vice in any court in the State of Hawaii that the pro hac vice status in this case was terminated and the reasons therefor[ ].

Because the Court cannot say that the Defendant and pro hac vice counsel, their conduct was calculated, knowing, and intentional in every instance, the Court cannot say that the Defendant and pro hac vice counsel are guilty of contempt [pursuant to HRS § 710-1077]. However, the Court specifically

finds that the conduct of Defendant and pro hac vice counsel as a whole is e[ ]gregious and disrespectful and that the sanctions stated before are clearly warranted in this case.

(Brackets and emphases added.) A written order was filed on December 24, 1996, in virtually verbatim form.

Cappello and Hudgens moved for reconsideration on January 3, 1997. In support, Cappello submitted an affidavit, on January 17, 1997, averring that he was admitted to practice before several state and federal courts, that he is a member of good standing in all of those courts, and that he has never been suspended, disbarred, or held in contempt in or before any of those courts. According to Cappello, Cappello & McCann has maintained an AV rating in the Martindale–Hubbell Law Directory for more than ten years, and Cappello is personally listed in *The Best Lawyers in America.* Cappello also averred that neither he nor Hudgens had any actual or constructive knowledge of the concerns regarding the CPB stock allegedly owned by Yoshio because, according to the order granting *pro hac vice* status, Cappello and Hudgens were never served with any relevant documents in the case. Cappello averred that BOH refused to serve appellants. Cappello attributed its ignorance of the receivership proceedings to local counsel, Young, because Young failed to supply them with filings or notify them of events surrounding the CPB stock.[9] Ultimately, Cappello cited *Enos v. Pacific Transfer & Warehouse, Inc.,* 79 Hawai'i 452, 903 P.2d 1273, *reconsideration denied,* 80 Hawai'i 187, 907 P.2d 773 (1995), for his contention that the circuit court's sanctions were in error, because there was no specific finding of bad faith. The motion for reconsideration was denied on February 26, 1997. Cappello and Hudgens appealed.

9. Young averred in an affidavit, filed January 13, 1997, that, in fact, he never gave or forwarded any pleading involving the receiver to Cappello and Hudgens, because they did not participate in the receivership.

## II. STANDARDS OF REVIEW

▆ Hawai'i circuit courts have the inherent power[10] and authority to control the litigation process before them and " 'to curb abuses and promote fair process[,] ... including[, for example,] the power to impose sanctions ... for 'abusive litigation practices.' " *Enos*, 79 Hawai'i at 458, 903 P.2d at 1279 (citing *Kukui Nuts of Hawaii, Inc. v. R. Baird & Co.*, 6 Haw.App. 431, 436, 726 P.2d 268, 272 (1986) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 65 L.Ed.2d 488 (1980)); *Richardson v. Sport Shinko (Waikiki Corp.)*, 76 Hawai'i 494, 507, 880 P.2d 169, 182 (1994) (brackets added)); *see also In re Dubin*, 9 Haw.App. 249, 259–60, 833 P.2d 85, 91, *cert. denied*, 73 Haw. 627, 834 P.2d 1315 (1992). A circuit court's inherent powers, however, must "be exercised with restraint and discretion." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27, *reh'g denied*, 501 U.S. 1269, 112 S.Ct. 12, 115 L.Ed.2d 1097 (1991); *see also Enos*, 79 Hawai'i at 458, 903 P.2d at 1279; *United States v. International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO*, 948 F.2d 1338, 1345 (2d Cir.1991).

▆ The circuit court's revocation of an out-of-state attorney's *pro hac vice* status, an action authorized by the inherent powers doctrine, is reviewed for an abuse of discretion. *See* RSCH Rule 1.9; *Ex parte Burr*, 22 U.S. (9 Wheat.) 529, 6 L.Ed. 152 (1824); *D.H. Overmyer Co. Inc. v. Robson*, 750 F.2d 31, 33 (6th Cir.1984); *Salstrom v. Citicorp Credit Serv. Inc.*, 74 F.3d 183, 185 (9th Cir.), *cert. denied*, 519 U.S. 813, 117 S.Ct. 60, 136 L.Ed.2d 23 (1996); *In re N. Ohio Tireworkers*, 92 Ohio App.3d 69, 634 N.E.2d 249, 252 (1993) (citing *Royal Indem. Co. v. J.C. Penney Co., Inc.*, 27 Ohio St.3d 31, 501 N.E.2d 617, 620 (1986)); *Hallmann v. Sturm Ruger & Co., Inc.*, 31 Wash.App. 50, 639 P.2d 805, 807–08 (1982).

▆ Similarly, "regardless whether sanctions are imposed pursuant to ... [statute, circuit court rule,] or the trial court's inherent powers, such awards are reviewed for an abuse of discretion." *Enos*, 79 Hawai'i at 459 n. 7, 903 P.2d at 1280 n. 7 (citing *In re Tax Appeal of Hawaiian Flour Mills, Inc.*, 76 Hawai'i 1, 15, 868 P.2d 419, 433 (1994)) (brackets added); *see also Kukui Nuts*, 6 Haw.App. at 436–37, 726 P.2d at 272. "A court abuses its discretion whenever it exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party." *Ho v. Leftwich*, 88 Hawai'i 251, 256, 965 P.2d 793, 798 (1998) (citations, internal quotation marks, and ellipses omitted); *see also Kukui Nuts*, 6 Haw.App. at 436–37, 726 P.2d at 272 (citations omitted).

▆ Hawai'i appellate courts review questions of constitutional law, *e.g.*, questions regarding procedural due process, *de novo*, under the right/wrong standard. *See State v. Hanapi*, 89 Hawai'i 177, 182, 970 P.2d 485, 490 (1998) (citations omitted); *Crosby v. State Dept. of Budget & Finance*, 76 Hawai'i 332, 341, 876 P.2d 1300, 1309 (1994), *cert. denied*, 513 U.S. 1081, 115 S.Ct. 731, 130 L.Ed.2d 635 (1995). "Under the right/wrong standard, this court 'examine[s] the facts and answer[s] the question without being required to give any weight to the trial court's answer to it.' " *In re Estate of Marcos*, 88 Hawai'i 148, 153, 963 P.2d 1124, 1129 (1998) (citation omitted).

## III. DISCUSSION

A. *The Circuit Court Did Not Deny Appellants Procedural Due Process When Revoking Appellants' Pro Hac Vice Status.*

▆ Appellants contend that the circuit court failed to give them any notice that it was considering immediate revocation of their *pro hac vice* status and/or failed to give

---

**10.** Hawai'i Revised Statutes (HRS) § 603–21.9 (1985) provides in part:

 **Powers.** The several circuit courts shall have power:

 ....

 (6) To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

them sufficient or particularized notice.[11] As a threshold matter, appellants completely failed to raise the issue of procedural due process before the circuit court. "[W]hen a party fails to raise an issue about the constitutionality of a ... sanction before the trial court, the reviewing appellate courts may deem the constitutional issue waived." *Kawamata Farms, Inc. v. United Agri Products*, 86 Hawai'i 214, 248–49, 948 P.2d 1055, 1089–90 (1997) (citations omitted). Therefore, appellants have waived this issue. Nevertheless, the record reveals that appellants were given reasonable notice of the specific charges.

 It is well settled that an out-of-state attorney has no right or entitlement under the United States Constitution (or the Hawai'i Constitution) to apply for or be granted *pro hac vice* status before any state court. *See Leis v. Flynt*, 439 U.S. 438, 442–43, 99 S.Ct. 698, 58 L.Ed.2d 717 (per curiam), *reh'g denied*, 441 U.S. 956, 99 S.Ct. 2185, 60 L.Ed.2d 1060 (1979). However, once an out-of-state attorney has been granted *pro hac vice* status in a particular case before a particular judge, the out-of-state attorney gains a "limited property interest" that is held pursuant to RSCH Rule 1.9. The deprivation of this property interest—"previously held under state law"—must be in accord with requisite constitutional safeguards. *Id.* (citing *Paul v. Davis*, 424 U.S. 693, 708–709, 96 S.Ct. 1155, 47 L.Ed.2d 405, *reh'g denied*, 425 U.S. 985, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976)); *Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 910 (3d Cir.1992); *United States v. Summet*, 862 F.2d 784, 787 (9th Cir.1988); *United States v. Collins*, 920 F.2d 619, 626 (10th Cir.1990), *cert. denied*, 500 U.S. 920, 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991); *Kirkland v. National Mortg. Network, Inc.*, 884 F.2d 1367, 1372 (11th Cir. 1989) (holding that, once admitted, *pro hac vice* counsel is afforded basic procedural rights); *cf. United States v. Cooper*, 872 F.2d 1, 2 (1st Cir.1989) (due process provided pursuant to local rule); *but see D.H. Overmyer*, 750 F.2d at 33–34 (implying that *Leis v. Flynt* holds that due process and equal

protection principles never apply to *pro hac vice* status).

Due process is not a fixed concept requiring a specific procedural course in every situation. *Sandy Beach Defense Fund v. City Council of the City and County of Honolulu*, 70 Haw. 361, 378, 773 P.2d 250, 261 (1989); *cf. Cafeteria & Restaurant Workers Union, Local 473 v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748–49, 6 L.Ed.2d 1230] ... (1961). Rather, due process is flexible and calls for such procedural protections as the particular situation demands. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] ... (1972). The basic elements of procedural due process of law require notice and an opportunity to be heard at a meaningful time and in a meaningful manner. *Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *see also Mathews v. Eldridge*, 424 U.S. 319, 333 [96 S.Ct. 893, 902, 47 L.Ed.2d 18] ... (1976); *North Georgia Finishing, Inc. v. Di–Chem, Inc.*, 419 U.S. 601, 605–06, [95 S.Ct. 719, 721–22, 42 L.Ed.2d 751] ... (1975).

*Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan*, 87 Hawai'i 217, 243, 953 P.2d 1315, 1341 (1998) (citations omitted) (brackets and ellipsis points in original); *see also* U.S. Const. amend. XIV, § 1; Haw. Const. art. I, § 5. Furthermore,

[d]etermination of the specific procedures required to satisfy due process requires a balancing of several factors: (1) the private interest which will be affected; (2) the risk of an erroneous deprivation of such interest through the procedures actually used, and the probable value, if any, of additional or alternative procedural safeguards; and (3) the governmental interest, including the burden that additional procedural safeguards would entail. *Mathews v. Eldridge*, 424 U.S. at 335, 96 S.Ct. at 903, 47 L.Ed.2d at 33; *Silver v. Castle Memorial Hosp.*, 53 Haw. [475,] 484, 497 P.2d [564,] 571 [ (1972) ].

*Sandy Beach Defense Fund*, 70 Haw. at 378, 773 P.2d at 261; *Korean Buddhist Dae Won*

---

11. In light of the numerous hearings held and continuances granted, appellants do not and cannot assert that they were deprived of a meaningful opportunity to be heard.

*Sa Temple of Hawaii,* 87 Hawai'i at 243, 953 P.2d at 1341 (some brackets in original); *see also Alejado v. City & County of Honolulu,* 89 Hawai'i 221, 226–27, 971 P.2d 310, 315–16 (App.1999).

▬ Here, local counsel was notified orally,[12] on July 23, 1996, that the *pro hac vice* status of Cappello and Hudgens was in jeopardy because of their receipt of 2,948 shares of CPB stock as payment for attorneys' fees. The circuit court ordered local counsel to inform Cappello and Hudgens that the stock certificates were to be turned over to the court and that an explanation of their conduct was expected. On July 31, 1996, Hudgens appeared and was personally notified that his and Cappello's *pro hac vice* status was in jeopardy because of their acceptance of the CPB stock in question as payment for attorneys' fees. The circuit court directed Hudgens to notify Cappello, his law partner. The second hearing was held on October 18, 1996, at which time, neither Cappello nor Hudgens appeared. Because the circuit court was concerned with due process considerations, it continued the hearing, for the fourth time, until November 22, 1996. At the same time, the circuit court specifically instructed local counsel to notify both Cappello and Hudgens that their *pro hac vice* status was in jeopardy and that sanctions would be imposed on November 22, 1996, regardless if Cappello and Hudgens were present.

In light of this record, the circuit court's oral notice (1) to local counsel on July 23, 1996, (2) to Hudgens on July 31, 1996, and (3) to local counsel on October 18, 1996 constitutes reasonable notice of the specific charges with respect to both Cappello and Hudgens.[13] Therefore, appellants were not denied procedural due process.

12. It is well settled in this jurisdiction that oral notice of the specific charges of contempt or misconduct comports with constitutional requirements of procedural due process. *See Evans v. Takao,* 74 Haw. 267, 285–87, 842 P.2d 255, 263–64 (1992).

13. We recognize that Cappello was not given oral notice personally by the circuit court. This court, however, has stated that "[d]ue process is

B. *The Circuit Court Did Not Abuse Its Discretion in Revoking Appellants' Pro Hac Vice Status, in Ordering Appellants to Disgorge the Proceeds of the CPB Stock Sale, or in Requiring Notice of the Revocation in Future Pro Hac Vice Applications.*

Appellants Cappello and Hudgens contend that they had neither actual nor constructive knowledge of the receiver's requests for the CPB stock certificates from Dr. and Yoshio Kunimoto, because they were not served with copies of the written correspondence from the receiver to Dr. Kunimoto and because local counsel failed to forward any copies of the filed pleadings. In short, relying upon *Enos* and *Kukui Nuts,* appellants contend that the circuit court erred, insofar as it failed to find by clear and convincing evidence (1) that appellants acted in bad faith or (2) that they intentionally received the CPB stock as payment for attorneys' fees in direct contravention of the circuit court's order. For the following reasons, appellants' arguments fail.

1. *The Requirement of a Finding of Bad Faith*

▬ "An attorney admitted to appear *pro hac vice* is subject to the [same professional and] ethical standards and supervision of the court [as local counsel]." *Hallmann,* 639 P.2d at 808 (citing *In re Rappaport,* 558 F.2d 87 (2d Cir.1977))) (brackets added); *see also Kirkland,* 884 F.2d at 1372. As noted earlier, the circuit court's revocation of an out-of-state attorney's *pro hac vice* status is a sanction imposed pursuant to the circuit court's inherent powers. *See* RSCH Rule 1.9. It is well settled that a court may not invoke its inherent powers to sanction an attorney without a specific finding of bad faith. *See Enos,* 79 Hawai'i at 458–59, 903 P.2d at 1279–80 ("holding that a necessary

not a fixed concept requiring a specific procedural course in every situation." *Korean Dae Won Sa Temple of Hawaii,* 87 Hawai'i at 243, 953 P.2d at 1341 (citation omitted). Under the circumstances, oral notice to local counsel Young and to Hudgens, with court instructions to notify Cappello, is sufficient. *See generally, Evans,* 74 Haw. at 285–87, 842 P.2d at 263–64.

[condition] precedent to any sanction of attorney's fees under the court's inherent powers was the finding that the attorney's conduct 'constituted or was tantamount to bad faith'") (citing *Kukui Nuts*, 6 Haw.App. at 436, 726 P.2d at 272 (citation omitted)); *Teamsters*, 948 F.2d at 1345 (stating that "this Court, in recognizing the need for restraint, has always required a particularized showing of bad faith to justify the use of the court's inherent power"); *Baldwin Hardware Corp. v. Franksu Enterprise Corp.*, 78 F.3d 550, 562 (Fed.Cir.) (applying bad faith standard to *pro hac vice* revocation), *cert. denied*, 519 U.S. 949, 117 S.Ct. 360, 136 L.Ed.2d 251 (1996). However, "[t]he trial court's power to protect its pending proceedings includes the authority to dismiss an attorney who cannot, or will not, take part in them with a reasonable degree of propriety." *Royal Indemn. Co., v. J.C. Penney Co., Inc.*, 27 Ohio St.3d 31, 501 N.E.2d 617, 620 (1986) (citing *Laughlin v. Eicher*, 145 F.2d 700 (D.C.Cir.1944)).

▇▇▇ In the instant case, "[a]lthough the words 'bad faith' are not recited in the order, the order makes clear that the trial judge considered [Messrs. Cappello and Hudgens] to have acted in bad faith[.]" *Baldwin Hardware Corp.*, 78 F.3d at 562 (brackets added). The circuit court expressly found: (1) that appellants "knew or should have known" that the CPB stock was in issue; (2) that appellants' conduct in receiving the stock constituted a fraud upon the court; and (3) that appellants' conduct was, at best, reckless and, at worst, knowing and intentional. These findings are tantamount to a specific finding of bad faith. In other words, these findings are sufficient to enable this court to infer a specific finding of bad faith by the circuit court.

### 2. *Appellants' Conduct Constituted Bad Faith*

▇▇▇ Appellants also contend that the record does not support a finding, by clear and convincing evidence, that their conduct in accepting the CPB stock constituted bad faith. We disagree. On appeal, this court has

> declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts.

[*Teamsters*, 948 F.2d at 1345] (quoting *Oliveri v. Thompson*, 803 F.2d 1265, 1272 (2d Cir.1986) (citations, internal brackets, and internal quotations marks omitted)) . . . .

Although it is well-settled that an appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance, we believe that, in order to facilitate a meaningful and more efficient appellate review, an order imposing sanctions should set forth findings that describe, with reasonable specificity, the perceived misconduct (such as harassment or bad faith conduct), as well as the appropriate sanctioning authority (*e.g.*, HRCP Rule 11 or the court's inherent power). For purposes of appellate review, a distinction must be made between zealous advocacy and plain pettifoggery.

*Kawamata Farms, Inc.*, 86 Hawai'i at 257, 948 P.2d at 1099 (quoting *Enos*, 79 Hawai'i at 457–59, 903 P.2d at 1278–80 (citations, internal quotation marks, original brackets, and footnote omitted)). Bad faith has also been "defined as 'actual or constructive fraud or a neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.'" *In re Estate of Marks*, 91 Wash.App. 325, 957 P.2d 235, 241 (1998) (addressing attorney's fees in a probate action) (some internal quotation marks omitted) (ellipses in original); *see generally In re CARL Corp.*, 85 Hawai'i 431, 451–52, 946 P.2d 1, 21–22 (1997) (holding that reckless conduct, under Hawai'i Administrative Rule § 3–126–36(c) (1995), constituted bad faith). Generally, the credibility of witnesses and the weight to be given their testimony are within the

province of the trial court and, generally, will not be disturbed on appeal. *See In re Estate of Herbert,* 90 Hawai'i 443, 454, 979 P.2d 39, 50 (1999) (citing *Steinberg v. Hoshijo,* 88 Hawai'i 10, 18, 960 P.2d 1218, 1226 (1998) (citation omitted)); *see also Krohnert v. Yacht Sys. Hawaii, Inc.,* 4 Haw.App. 190, 197, 664 P.2d 738, 743 (1983).

### a. *The Revocation of Appellants' Pro Hac Vice Status*

The record reveals that the issue of Dr. Kunimoto's alleged concealment of assets, at the latest, was raised on November 20, 1995, when BOH moved for a TRO and furnished the circuit court with a copy of the United States Bankruptcy Court's findings and conclusions in *In re Clark Emerson Venture, Inc.,* Case No. 92–01388, providing that Kunimoto made false and misleading representations in his disclosure statements and related filings before the bankruptcy court and committed a fraud upon the bankruptcy court. On December 1, 1995, BOH also moved for the appointment of an independent receiver to aid in the execution of the deficiency judgments, again detailing Dr. Kunimoto's attempts fraudulently to transfer his medical practice, as well as Dr. Kunimoto's suspected concealment of stocks. At the December 12, 1995 hearing, the circuit court specifically found:

> that defendant Kunimoto has and would in the future probably engage in conduct or transfers which would violate or be in violation of Hawaii Revised Statutes Chapter 651C.... The court believes and finds that the defendant continues to hinder, delay, or defraud the plaintiff by engaging in conduct which is in violation of Hawaii Revised Statutes, Chapter 651C. Defendant's conduct, an example of which is described in federal bankruptcy Judge King's findings of fact and conclusions of law and order, should not be tolerated.
>
> . . . .
>
> In addition[, . . . ] the court further finds that defendant Allan Kunimoto has made misrepresentations of material fact and engaged in a course of conduct designed to hinder and delay the plaintiff's collection

efforts and that without the appointment of a receiver, the court believes that he would continue in his willful course of conduct and frustrate the plaintiff's efforts to account for and collect on its outstanding . . . judgment.

On December 20, 1995, the court granted BOH's motion, incorporated by reference the oral findings entered on December 12, 1995, and specifically granted the receiver power to "locate and to take possession and control of Kunimoto's stock certificates[.]" Cappello and Hudgens's *pro hac vice* application was granted on December 28, 1995, amidst receivership.

The receiver's first and second reports, dated February 20, 1996 and March 20, 1996, detailed Dr. Kunimoto's efforts to prevent BOH's collection. The receiver determined on or about February 9, 1996 that Dr. Kunimoto was the registered owner of 5,406 common shares of CPB stock. At that time, there was no indication that the stock had been transferred to Yoshio Kunimoto. Because Dr. Kunimoto refused to sign the stock reissuance forms, the receiver moved, on March 21, 1996, to order him to sign the replacement forms. Because Dr. Kunimoto failed to comply, the receiver moved for instructions from the circuit court on June 25, 1996, explaining that Dr. Kunimoto finally returned the stock reissuance forms but altered them to indicate that his father was the "equitable" owner. The receiver submitted the forms to Chemical Mellon, which rejected them because Dr. Kunimoto was, in fact, the sole owner of record of the 5,406 shares. On June 25, 1996, the receiver filed with the circuit court a detailed explanation of Dr. Kunimoto's conduct in altering the stock certificates for 2,948 shares of the CPB stock to appear to be equitably owned by his father, even though Dr. Kunimoto was the sole owner of record with Chemical Mellon.

Apparently on June 13, 1996, Yoshio Kunimoto transferred the same 2,948 shares, allegedly assigned to him by Dr. Kunimoto on February 2 and 28, 1989, to Cappello and McCann for payment of his son's attorneys' fees. Appellants sent the stock certificates to their stockbroker on July 5, 1996. They

were sold on approximately July 18, 1996 for $90,247.50. Dr. Kunimoto revealed the location of the 2,948 shares on July 23, 1996, five days after they were sold.

When asked by the circuit court, on November 22, 1996, specifically about his knowledge regarding the June 28, 1996 hearing at which Yoshio Kunimoto was questioned about the CPB stock shares, Hudgens explained:

> Your Honor, our understanding of that was the CPB stock—there are five shares—five certificates of CPB stock.... My understanding of that at the time was that those shares of stock the Court was questioning related to the three shares of stock which Dr. Kunimoto had signed on the application prepared for him by the receiver and had crossed out the ownership of it and had put in that he only owned a portion of it and his father owned shares. That, I believe, was the focus....

As noted above, the credibility of witnesses, in the instant case, is within the province of the circuit court. On this record, the circuit court's findings, *e.g.*, that appellants' actions were knowing and intentional, are "findings that describe, with reasonable specificity, the perceived misconduct." *See Kawamata Farms, Inc.*, 86 Hawai'i at 257, 948 P.2d at 1099 (citation omitted). These findings are supported by the record.

Even assuming arguendo that the circuit court found that appellants' actions were only reckless, their conduct still constitutes bad faith. RSCH Rule 2.1 provides that "any attorney admitted specially by a court of this state for a particular proceeding is subject to the ... disciplinary jurisdiction of the [Hawai'i] supreme court ..." RSCH Rule 2.2 expressly provides that the Hawai'i Rules of Professional Conduct govern the conduct of all attorneys appearing before Hawai'i courts.

Hawai'i Rules of Professional Conduct (HRPC) Rule 1.1 (1993) provides that "[a] lawyer shall provide competent representa-

tion to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." HRPC Rule 1.3 requires that "[a] lawyer shall act with reasonable diligence and promptness in representing a client. Furthermore, HRPC Rule 3.4 provides that "[a] lawyer shall not ... unlawfully obstruct another party's access to evidence or unlawfully alter, destroy or conceal a document or other material having potential evidentiary value. A lawyer shall not counsel or assist another person to do any such act[.]" Therefore, because an attorney of record, whether a licensed member of the Hawai'i bar or an attorney permitted to appear *pro hac vice*, is charged with (1) possessing the requisite knowledge, thoroughness, and preparation to provide competent representation, (2) acting with reasonable diligence and promptness, and (3) *not* obstructing another party's access to evidence or unlawfully altering, destroying or concealing a document or other material having potential evidentiary value or assisting another person to do so, it is elementary that an attorney of record must be familiar with the facts and pleadings in the case.[14]

At the very least, appellants' conduct in accepting the CPB stocks was a reckless failure to comply with the Hawai'i Rules of Professional Conduct, particularly HRPC Rule 3.4, or an attempt to receive payment for attorneys' fees from a judgment debtor amidst a receivership action, while wilfully ignorant of the facts and pleadings in the case. *See In re Estate of Marks*, 957 P.2d at 241. Appellants, as counsel of record, should have known that Dr. Kunimoto was accused of and found to have intentionally concealed assets and fraudulently transferred his assets to avoid payment to BOH. Indeed, it is apparent that appellants would have discovered the specific concern regarding the CPB stock if they had investigated beyond the "face" of the stock certificates. Further, it is incomprehensible that experienced *pro hac vice* counsel would accept stocks as payment for attorneys' fees from a judgment debtor

---

14. At the July 31, 1996 and November 22, 1996 hearings, Hudgens conceded that *pro hac vice* counsel are charged with the same obligations as are licensed Hawai'i counsel.

amidst a receivership action without even contacting local counsel to discuss the ownership of the stocks.

In light of the well-developed record regarding Dr. Kunimoto's attempts to conceal his assets, the ongoing and apparent efforts by the receiver to obtain the CPB stock for a determination of ownership, and appellants' obligations under the Hawai'i Rules of Professional Conduct, appellants' reckless and/or intentional conduct constituted bad faith. The circuit court's findings in this regard are supported by clear and convincing evidence in the record. Accordingly, considering that Cappello and Hudgens were permitted to appear in the presentation of the instant case at the discretion of the presiding judge, the circuit court did not abuse its discretion in revoking appellants' *pro hac vice* status.

b. *The Disgorgement of the Stock Sale Proceeds*

■ Similarly, the circuit court did not abuse its discretion in ordering disgorgement of the proceeds of the CPB stock sale. Although cited by neither party, *Ramil v. Keller*, 68 Haw. 608, 616–17, 726 P.2d 254, 259–60 (1986), provides much guidance for the instant case. In *Ramil v. Keller*, the insurance commissioner appointed himself receiver of a financially troubled insurance company, pursuant to HRS § 431:653. Instead of rehabilitation, the commissioner sought permission to liquidate the ailing insurance company. *Id.* at 611, 726 P.2d at 256. When the defendants misappropriated and misapplied the insurance company's funds and assets for personal use during receivership, the circuit court granted both temporary and preliminary injunctions against the defendants in favor of the commissioner. When it was apparent to the circuit court that the injunctions "did not bring a halt to attempts by the defendants to put assets beyond the reach of the receiver or the court," the circuit court ordered the defendants to show cause why judgment should not be entered against them. *Id.* at 614, 726 P.2d at 259. After reviewing the evidence presented at the show-cause hearing and the earlier hearing on the motion for a preliminary injunction,

the circuit court found that "the violations 'would permit the defendants to conceal or dispose of the monies and other assets the equitable ownership of which is the subject of this action and destroy the Court's ability to grant effective relief.'" *Id.* The circuit court entered judgment in favor of the commissioner.

On appeal, this court, relying upon HRS § 603–21.9(6) (the inherent powers doctrine), affirmed the circuit court's judgment, because the entry of judgment "prevented the parties against whom sanctions were imposed from profiting by their own violations." *Id.* at 620, 726 P.2d at 262 (citing *Fields v. Stauffer Publications, Inc.*, 2 Kan.App.2d 323, 578 P.2d 1138, 1143 (1978) (citations omitted)) (internal brackets omitted). Indeed, "[c]ircuit courts also have broad discretion to sanction litigants pursuant to their 'inherent equity, supervisory, and administrative powers as well as inherent power to control the litigation process before them.'" *Kawamata Farms, Inc.*, 86 Hawai'i at 247–48, 948 P.2d at 1088–89 (citing *Richardson*, 76 Hawai'i at 507, 880 P.2d at 182).

Notwithstanding the sanction-like form of the order, the circuit court's requirement that Cappello and Hudgens disgorge the proceeds specifically reserved the issue of ownership regarding the 2,948 shares of CPB stock for a later date. The circuit court's order promoted justice in the matter pending, *i.e.*, it preserved the circuit court's authority and ability to grant BOH effective relief in maintaining the relative status quo regarding Dr. Kunimoto's alleged assets. On this record, the circuit court did not abuse its discretion.

c. *Future Notification of Revocation*

■ Finally, the circuit court ordered appellants to reveal in any future *pro hac vice* applications in Hawai'i that their status was revoked in the instant case and the reasons therefor. As stated above, the circuit court entered the instant sanctions pursuant to the inherent powers doctrine of HRS § 603–21.9(6).

■ Specifically addressing the revocation of *pro hac vice* status and the imposi-

tion of permanent prospective sanctions pursuant to the inherent powers doctrine, the United States Court of Appeals for the Federal Circuit stated:

"Any court which has the power to admit attorneys to practice may also sanction them for unprofessional conduct." *Standing Committee on Discipline v. Ross,* 735 F.2d 1168, 1170 (9th Cir.1984); *see also Yagman v. Republic Insurance,* 987 F.2d 622, 628 (9th Cir.1993). That power encompasses the authority to suspend an attorney admitted *pro hac vice* from further practice before the court. *United States v. Engstrom,* 16 F.3d 1006 (9th Cir.1994) (upholding order suspending attorney admitted pro hac vice from practice before the court for three years).

*Baldwin Hardware Corp.,* 78 F.3d at 562; *see also In re Fletcher,* 655 N.E.2d 58, 61 (Ind.1995) (citing *Paramount Communications v. QVC Network,* 637 A.2d 34, 53 (Del.Super.1994)). *See generally MacDraw, Inc. v. The CIT Group Equipment Financing, Inc.,* 157 F.3d 956, 960 n. 3 (2d Cir.1998).

The language employed by the Federal Circuit Court is persuasive. Public policy and common sense support the circuit court's reasoning that an attorney whose *pro hac vice* status has been revoked can be compelled to notify Hawai'i courts in future applications of such a revocation. Again, on this record, the circuit court did not abuse its discretion.

## IV. CONCLUSION

Based upon the foregoing, we affirm.