**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-17-0000199**
**29-MAR-2019**
**08:52 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---


DANIEL M. SANDOMIRE; KATY YEN-JU CHEN; TRUDI MELOHN,
individually and as Co-Trustee under the William Charles
Melohn III Revocable Trust dated June 4, 2010 and
Co-Trustee under the Trudi Melohn Revocable Trust dated
June 4, 2010; and WILLIAM CHARLES MELOHN III,
individually and as Co-Trustee under the William Charles
Melohn III Revocable Trust dated June 4, 2010 and
Co-Trustee under the Trudi Melohn Revocable Trust dated
June 4, 2010, Plaintiffs-Appellees,
v.
DAVID EDWARD BROWN and LANHUA KAO BROWN,
Defendants-Appellants


NO. CAAP-17-0000199


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 15-1-2267)


MARCH 29, 2019


FUJISE, PRESIDING JUDGE, LEONARD AND REIFURTH, JJ.


OPINION OF THE COURT BY LEONARD, J.

This case arises out of a dispute between neighbors over whether a proposed home addition would violate certain restrictive covenants that are applicable to their neighborhood. As discussed herein, we hold that the trial court erred in failing to first make a legal determination whether the express language of the height restriction is ambiguous. If, as a matter of law, the express language of the restrictive covenant is unambiguous, then there is no basis for a factual inquiry into the "reasonableness" of the restriction, as the trial court did in this case. In addition, we hold that the trial court erred in adopting an interpretation of the height restriction that would effectively add a requirement not expressly stated in the restrictive covenants. However, we conclude that the trial court did not err in applying the lot coverage area restriction. Finally, we conclude that the trial court's permanent injunctions are flawed and the attorneys' fees awards must be vacated. The case is remanded.

Defendants-Appellants David Edward Brown and Lanhua Kao Brown (**Browns** or **Defendants**) appeal from the February 21, 2017 Final Judgment in Favor of Plaintiffs (**Judgment**), which was entered in favor of Plaintiffs-Appellees Daniel M. Sandomire, Katy Yen-Ju Chen, Trudi Melohn, and William Charles Melohn III (collectively, **Plaintiffs**), by the Circuit Court of the First Circuit (**Circuit Court**).[1] The Browns also challenge the Circuit Court's: (1) December 20, 2016 Order Granting Plaintiffs'

_____

[1] The Honorable Karen T. Nakasone presided.

2

Attorneys' Fees and Costs Based on the Declaration of Michael W. Gibson Regarding Attorneys' Fees and Costs Incurred by Plaintiffs (**Attorneys' Fees Order**); (2) May 25, 2016 Order Granting Plaintiffs' Motion for Preliminary Injunction (**Order Granting Preliminary Injunction**); (3) August 12, 2016 Findings of Fact, Conclusions of Law, and Order Granting Relief on Counts II and III (**Order on Counts II and III**); and (4) March 21, 2017 Order Granting in Part and Denying in Part Plaintiffs' Motion for Supplemental Attorneys' Fees and Costs (**Supplemental Fees Order**).

I.    BACKGROUND

On November 23, 2015, Plaintiffs, neighboring homeowners to the Browns, filed the Complaint in this action, alleging, *inter alia*, that the Browns own real property, specifically, Lot 71 (**the Subject Lot**) on Alaweo Street, which is in the Waialae-Iki View Lots, Unit IV subdivision (**Waialae-Iki View Lots**), in Honolulu.  The Complaint further alleged that the Browns intended to construct an addition to their home, which included, *inter alia*, adding a second floor onto their existing structure that, if constructed, would violate the restrictive covenants running with the Browns' land.[2]  Plaintiffs alleged that the proposed addition would exceed the lot coverage maximum

---

[2]    The parties agree that the following documents comprise the restrictive covenants that run with the land situated in the Waialae-Iki View Lots and are therefore binding on the Subject Lot:  (1) Building Requirements for Waialae-Iki View Lots, Unit IV; (2) First Amendment of Building Requirements for Waialae-Iki View Lots, Unit IV; (3) Supplemental Building Requirements; and (4) Declaration of Protective Provisions.  They are referred to collectively herein as the **Subdivision Documents.**

and violate the height restriction, which are set forth as follows in the Subdivision Documents:

> 1. <u>View Channels, Setback Lines, Building Area and Lot Coverage Area.</u>
>
> . . . .
>
> (d)   The <u>Lot Coverage Area</u>, being the maximum total area under roof and trellis work within the wall lines and/or the outer vertical support members (including balcony railings) of all buildings on the lot, shall amount to not more than one-third (1/3) of the area of the lot.
>
> . . . .
>
> 12. <u>Height of Buildings, Antennas or Chimneys.</u>
>
> (a)   No portion of any building or other structure, except antennas and chimneys, shall be more than 18 feet above the highest existing ground elevation at the building or structure. For houses with setbacks greater than that required, the height shall not project above an imaginary plane constructed over the building area as follows:
>
> > (1)   Commencing at a corner of the building area with the highest ground elevation, measure vertically to a point 18 feet above the corner. This point shall be a corner of the "height plane".
> >
> > (2)   Slope this plane downward at a ratio of 1 vertical to 10 horizontal towards the corner of the building area with the lowest ground elevation.

Plaintiffs sought declaratory and injunctive relief to enjoin the Browns from proceeding with their proposed construction. Plaintiffs also requested attorneys' fees and costs.

On March 31, 2016, Plaintiffs filed a Motion for Preliminary Injunction, based on the allegations in the Complaint, but further arguing that the Browns' proposed construction would violate additional restrictive covenants.[3] At

---

[3]   Specifically, Plaintiffs argued that: (1) the proposed construction would violate a purported prohibition against flat roofs within
(continued...)

4

the hearing on the motion, the Circuit Court stated that "with regard to the height restriction only, the Court's ruling is that the likelihood of success factor has been met" and granted Plaintiffs' motion.

At an evidentiary hearing on the merits of Counts II (Permanent Injunction) and III (Declaratory Relief), which was held on July 5, 7, 8, and 12, 2016, Plaintiffs presented testimony from Plaintiff Daniel Sandomire (**Sandomire**), as well as architects James Reinhardt (**Reinhardt**) and Fritz Johnson (**Johnson**).

Sandomire testified that he purchased his home in the Waialae-Iki View Lots and has lived there with his family since 2013. He and his family decided to move there because of the "beautiful neighborhood" that is close to his children's schools and has a "very attractive . . . varying architecture and landscape design."

Sandomire testified that in the summer of 2014, he learned that the Browns were exploring the possibility of constructing an addition on their home. Out of concern about the

---

[3](...continued)
Waialae-Iki View Lots; (2) the flat roof would serve as a platform for photovoltaic solar panels, "further exacerbating the height restriction violation"; (3) the second story might be used as a second dwelling unit in violation of both the restrictive covenants and the Land Use Ordinance of the City and County of Honolulu (**LUO**); and (4) the Browns violated a purported requirement in the Subdivision Documents to have a licensed architect prepare the drawings for the proposed construction. The Circuit Court ruled in favor of the Browns on the first three of these issues in response to the Browns' motion for judgment as a matter of law during the evidentiary hearing, which is not at issue in this appeal. The Circuit Court also ruled against Plaintiffs on the assertion that the Browns were required to have involved a licensed architect in their construction plans in its Order on Counts II and III following the evidentiary hearing. Neither side has raised these issues on appeal.

possible construction, Sandomire and the other surrounding neighbors drafted a letter to the Browns, introducing themselves, reminding the Browns of the applicable height restriction within the Subdivision Documents, and requesting to view the preliminary drawings of any proposed construction. Through an exchange of emails, Sandomire learned that the Browns intended to build the addition to their home, but that the Browns were interpreting the applicable height restriction to allow a much higher structure than Sandomire believed was permitted.

Sandomire testified that he was very concerned that the proposed construction would negatively impact himself and his immediate neighbors as well as the community, which was designed to allow for ocean and Diamond Head views, because the Browns' proposed plans would "destroy the views of the adjacent houses to him." Sandomire was also concerned that a violation of the Subdivision Documents would leave only the LUO to govern the Waialae-Iki View Lots, which would "impact[] the character of the neighborhood tremendously."

The Circuit Court allowed Sandomire to give expert testimony in the area of architecture and for the interpretation of covenants, conditions, and restrictions (**CC&Rs**). First, Sandomire cited the lot coverage provision under the Subdivision Documents and opined that the Browns' proposed construction exceeds the maximum, because the proposed construction would cover thirty-nine percent of the lot. Sandomire testified that even if the Browns did not build a deck that was included in

6

their original plans it would still exceed the maximum because the Browns' current home is already in excess of the thirty-three percent lot coverage allowance. During cross-examination, Sandomire acknowledged that his calculation incorrectly included a side lanai that is not included in the construction plans, but asserted that there is a portion of additional coverage that will still need to be included in the calculation. He also testified he was aware that some of the trellis work would be removed by the construction, but he did not have a calculation for how that would impact the lot coverage.

As to the height limitation, Sandomire testified that he interprets the applicable language in the Subdivision Documents to provide "two methods to determine the height" and that "it's optional which one you would use." Sandomire opined that under "Method 1 . . . we go from a point 18 feet above the building and follow the grade," creating a limitation that "would descend according to the slope of the lot." Under "Method 2," for "houses with setbacks greater than required," the point would begin "18 feet above the highest building area at the property line, . . . draw descending at an even grade towards the lowest point . . . [by] one unit vertical over ten units." According to Sandomire, the Browns' proposed construction violated either method.[4] During cross-examination, Sandomire acknowledged that

_____

[4]     Sandomire briefly addressed the assertion by Defendants' expert (**Tusher**) that Sandomire's own house violated the sloping plane interpretation of "Method 1," by stating that Tusher used the incorrect survey and starting grade elevation. He also responded to Tusher's assertion that numerous
(continued...)

the Subdivision Documents do not guarantee an "unobstructed view from [his] property" and that there is "no view channel easement on his lot" or the Brown lot. However, during redirect, Sandomire explained that the "fact that there's not one there doesn't mean that you don't have any restrictions of building. You're still restricted to build only 18 feet."[5]

Reinhardt testified for Plaintiffs as an expert in the area of architecture and the interpretation of CC&Rs. Reinhardt testified that he is generally familiar with the Subdivision Documents of Waialae-Iki View Lots, and that he had reviewed the Browns' proposed addition, which, in his opinion, fails to comply with the Subdivision Documents by exceeding the one-third lot coverage maximum and by exceeding the height limits.

As for lot coverage, Reinhardt testified that when the Brown residence was originally constructed, the Tax Department documents indicated that the square footage equated to the allowable thirty-three and a third percent. Subsequently, however, two trellises were built that were not shown on the original permits, which added approximately 200 square feet, thus

---

[4](...continued)
Building Department drawings support Tusher's interpretation of the height limit, submitting that those drawings are excerpts of building permit drawings, which do not establish compliance with the CC&Rs.

[5] During cross-examination, the Browns' counsel primarily questioned Sandomire on the feasibility of applying a sloping height restriction to "every bump and curve of the lot" and how to use the mass grading plans to establish the eighteen-foot height limitation. Counsel also questioned Sandomire about the differences in elevation points between the mass grading plans and other surveys of the Brown lot. There was also a brief inquiry regarding the setback lines, but this appeared to be directed mostly at reaching a common definition of "setback."

putting the lot coverage "over the allowable maximum . . . before [the] Brown[s] had got involved." Finally, the proposed addition covers three areas of the lots that were not previously covered, which takes them "well over" the one-third lot coverage maximum. During cross-examination, Reinhardt explained that even if the first-floor deck proposed in the drawings was not under roof, it would still count as lot coverage per the allowance in the Subdivision Documents.

Reinhardt also testified that he interpreted the height restriction as Sandomire had, as providing for two "methods" and that the proposed construction would exceed either height restriction method.[6] Reinhardt recognized that the height restriction provision does not include "either/or" language but that he believes it is clear from "how it is then described that you have to use one or the other." Reinhardt acknowledged during cross-examination that the "highest existing ground elevation" referred to a "single point" and that "you cannot exceed 18 feet above [the] point" but reiterated that his interpretation of that language is that it is "a sloping plane parallel to the grade." Reinhardt also testified that the Browns' house has setbacks greater than required on all sides and that "Method 2 must have been used when this house was originally built," but reiterated that, because the methods are options, "Method 1, the parallel-

---

[6] Reinhardt also indicated certain errors and inconsistencies between the Browns' proposed drawings and the various surveys conducted on the Brown lot. During cross-examination, there was extensive questioning about the purported inconsistencies in certain elevation drawings on which Reinhardt relied.

to-the-grade, works better in this lot, so that's what they used."

Johnson also testified as an expert in the area of architecture and with respect to interpreting CC&Rs, but only to offer his opinion regarding the height restriction as applied to the Browns' proposed construction. Johnson testified that he had made a site inspection in Waialae-Iki View Lots in November 2015, during which he met with the Sandomires, viewed the drawings for the Sandomire home, a mass grading plan, permit drawings for the Browns' house, the existing house, and the topographic survey for the house. Johnson viewed the Browns' property from both the Sandomire and Melohn residences and from the street side. Johnson also reviewed the Subdivision Documents and the Browns' proposed construction drawings. Additionally, Johnson testified that he had previously designed three homes in the Waialae-Iki View Lots and thus was familiar with the height restrictions. Johnson initially testified that he had designed three homes, but on cross-examination admitted that he had designed a fourth but said he could not remember the address and "didn't want to estimate or guess." During cross-examination, counsel for the Browns asked whether Johnson's drawings for those other homes would indicate, as is the standard practice, the "call-outs" for the Waialae-Iki View Lots CC&R height restrictions. Johnson acknowledged that it would be standard practice but declined to verify that the drawings he was shown during his testimony showed "the 18-foot horizontal call-out."

10

Johnson testified that he was "familiar with Method 1 and Method 2" of the height restriction and that he did not believe that the Browns' proposed construction complied with either. Regarding the other houses he designed in Waialae-Iki View Lots, Johnson testified that he used Method 2 for all of the homes because "when [he] went through the design review process, Method 1 did not apply as a horizontal plane. It followed the grade of the land." He also explained the review process he went through with the design review committee when it was in existence.

During cross-examination, Johnson admitted that the height restriction provision does not include the language "following the existing grade" or language that Method 2 is "intended to be a bonus." He acknowledged the section in his report in which he described "different ways height restrictions can be set forth in [covenants]" and that "18 feet high at the highest buildable point and follow the grade over the entire lot" is different than "18 feet above the highest existing ground elevation at the building or structure." Finally, he acknowledged that he still had unanswered questions regarding when a house has setbacks greater than required in order to "qualify" for Method 2.

Following Johnson's testimony, Plaintiffs rested their case and the Browns moved for a judgment as a matter of law on all issues. The Circuit Court granted the motion in part as described in note 3, *supra*.

Defendant David Brown (**Brown**) testified first for the defense and then called architects Terry Tusher (**Tusher**) and Kenneth Butterbaugh (**Butterbaugh**).

Brown testified that he, along with his wife, are the owners of the Subject Lot, which is their intended retirement home. Brown testified that he and his wife do not plan to construct everything that is shown in the proposed construction drawings, as they do not intend to build a deck. However, Brown testified during cross-examination that they had not obtained nor attempted to obtain a construction modification permit. During re-direct, Brown testified that they did not request a construction modification permit because the modifications were minimal and he was told that the Building Department would not object to such a relatively minor modification.

Tusher testified next for the Browns. Over Plaintiffs' objection, the Circuit Court permitted Tusher's testimony as an expert witness in the field of architecture and to interpret CC&Rs. Tusher initially testified that his interpretation of the height restriction is "that it was and is a horizontal line that is established by the highest buildable point of the corner of the property." Tusher later clarified, during cross-examination that this was a misstatement, because his opinion was that, for Method 1, the starting point is at the corner of the building with the highest existing ground elevation, which is not necessarily the highest buildable point on the lot. For "houses with setbacks greater than required," Tusher agreed that the

height was restricted to an imaginary plane sloping at one foot vertical to ten horizontal, commencing at the corner of the building area with the highest ground elevation measured vertically to a point 18 feet above the corner. Tusher further agreed that there were two methods described in the Subdivision Documents and that they "defin[e] the height envelope that could be built." According to Tusher, the proposed construction for the Brown property "meets the height envelope" for the first method and that the second method "should not be imposed on the Brown lot."

Tusher testified that he reviewed a number of drawings from Waialae-Iki View Lots that were submitted to the Building Department and that had received approvals by the Waialae-Iki View Lots design review committee. He initially did not review all of the available blueprints, but the ones he did review confirmed his interpretation of the height restriction as a horizontal plane either because "of a dimension that was tied to the corner of the building" or because "it was actually physically noted on the drawings." He did not find any notation indicating that the restriction followed the grade of the topography. Tusher subsequently conducted a modeling analysis of all available building permits that were issued for properties in Waialae-Iki View Lots, including one of the homes designed by Johnson, and found that of the drawings that referenced the Waialae-Iki View Lots height restriction, there were no properties that stayed within eighteen feet of the grade. During

13

cross-examination, Tusher acknowledged that there were some drawings that did not include a "call-out" to the horizontal Waialae-Iki View Lots standards. Tusher also admitted that he did not have information for almost half of the homes in Waialae-Iki View Lots and that his report includes a mistake as to one of the diagrams, which he discovered after receiving drawings from Plaintiffs' counsel, apparently after the report was written.

Tusher also testified that he had performed an analysis of the lot coverage for the proposed renovation of the Brown property. Upon reviewing the renovation drawings prepared for the Browns, Tusher opined that "there is a net reduction in the amount of lot coverage with this renovation." Tusher did not perform his own calculation of the Brown's current lot coverage, because it "wasn't important to us . . . in an existing condition" and the records for the original permit for the Brown residence do not exist. During cross-examination, Tusher agreed that the proposed addition would add lot coverage that was not covered today, but explained that the Browns' proposal included decreased lot coverage in other areas.

Although Butterbaugh was a licensed architect, he was presented as a fact witness, rather than as an expert witness. Butterbaugh testified that he was contacted by a draftsman for the Browns to answer certain questions about their proposed construction project, but that he was never formally retained to work on the project. He was also contacted by Sandomire, and

while they exchanged emails about the height restriction, in which Butterbaugh noted that Sandomire "had made a compelling case for his opinion," Butterbaugh "never came to a conclusion either way" as to whether the proposed construction complied with the Subdivision Documents. Butterbaugh's testimony was apparently offered to counter an assertion by the Plaintiffs that Butterbaugh had opined that he agreed with Johnson's opinion that the Browns' plans were not in compliance with the Subdivision Documents.

The Circuit Court entered the Order on Counts II and III on August 12, 2016. In granting the relief to Plaintiffs, the Circuit Court included, *inter alia*, the following findings of fact (**FOFs**) and conclusions of law (**COLs**):

> 16. The Subdivision Documents expressly state the intent underlying the covenants and restrictions[:]
>
> . . . .
>
> > "to develop and maintain the general attractiveness of the subdivision, as seen from all public areas, to provide each lessee as much undisturbed view and unobstructed breeze as practicable, to promote esthetic standards for buildings and their relationship to each other, to public spaces and to the site[.]"
>
> . . . .
>
> 36. All experts agreed that [the height restriction] provision describes two methods for determining the height limit of a house in the Waialae-Iki View Lots. . . . All experts agreed on the interpretation of Method 2, but Plaintiffs' and Defendants' experts differed on the interpretation of Method 1.
>
> 37. All experts agreed that Method 2 applies "[f]or houses with setbacks greater than that required." In other words, Method Two applies to a house built narrower than required by the Subdivision Documents and the applicable ordinances, and is not as wide as it could be. All experts agreed that Method 2 describes a sloping plane that runs at a slope of 1 foot to 10 feet.

38. [Defendants] interpreted Method 1 as describing a horizontal plane that begins at 18 feet above the highest existing ground elevation at the building and extends horizontally.

39. Plaintiffs and their experts interpreted Method 1 as a sloping plane that runs parallel to the ground at a height of 18 feet at each existing ground elevation point at the building.

40. The court agrees with Plaintiffs' experts that [Defendants'] interpretation of Method 1 is unreasonable, contrary to the Subdivision Documents' expressed intent, and would render Method 2 meaningless.

41. Under Tusher's interpretation, Method 1 would always allow for a wider and taller house in comparison to Method 2. Under Tusher's Method 1, a house built to be as wide as it could be (i.e., using the minimum setbacks) would also be able to build up to 18 feet extending out in a horizontal plane from the highest point. On the other hand, a house built to be narrower than required (i.e., using greater tan minimum setbacks) would only be able to build along the 1:10 sloping plane, under Method 2. This is not a reasonable interpretation of the Height Restriction.

42. Plaintiffs' experts testified that Method 2 exists to grant a "height bonus" to narrower houses with setbacks greater than that required. Under Plaintiffs' interpretation, depending on the slope of the lot, Method 2's 1:10 sloping plane may allow for a taller home than Method 1's sloping plane. Thus, a homeowner may choose Method 2 and build a house narrower than required, in exchange for the "height bonus" or additional height allowed under Method 2's sloping plane. This is a reasonable interpretation of the Height Restriction that preserves and effectuates both Method 1 and Method 2.

43. Defendants' interpretation vitiates Method 2. Under Tusher's interpretation, Method 1's 18' horizontal plane extending out and minimum setbacks would always allow for a taller and wider home than Method 2's sloping plane and greater-than-minimum setbacks. A homeowner would have no reason to choose Method 2.

44. Defendants' interpretation relies solely on the first sentence of the height restriction provision, while failing to relate to or give meaning to the remaining sentences of the height restriction.

45. The Court disagrees with Defendants' argument that Plaintiffs' interpretation of Method 1 renders the word "highest" superfluous. The word "highest" signifies the "highest existing ground elevation of the building," from where the 18 feet height can be measured from; Method 1 sets the maximum height to 18 feet above this "highest" point.

46. The Court adopts Plaintiffs' interpretation of Method 1. Plaintiffs' interpretation gives meaningful effect to the entire language of the height restriction; reasonably relates the two methods to one another; is consistent with the sloping terrain of the Waialae-Iki View

16

Lots; and complies with the Subdivision Documents' expressed intent "to develop and maintain the general attractiveness of the subdivision, as seen from all public areas, to provide each lessee as much undisturbed view and unobstructed breeze as practicable, to promote esthetic standards for the buildings and their relationship to each other, to public spaces and to the site," and of "protecting, preserving and maintaining the value, desirability and attractiveness of the Residential Area[.]

. . . .

48. Defendants' proposed construction does not comply with either Method 1 or Method 2, as construed and applied herein.[7] Therefore, <u>the court finds that Defendants' proposed construction violates the Height Restriction under the Subdivision Documents</u>.

. . . .

64. Based on the [FOFs] above, the Court concludes that <u>the Subdivision Documents' provisions regarding the Height Restriction are not ambiguous. While a facial ambiguity exists when reading Method 1 in isolation, the ambiguity is resolved when both Method 1 and Method 2 are read together as a whole</u>.

65. To the extent any ambiguity exists with regards to the Height Restriction, the Court concludes that Plaintiffs' interpretation is consistent with the Subdivision Documents' expressed intention, and gives "a reasonable, lawful, and effective meaning to all the terms," while Defendants' interpretation renders significant provisions of the Subdivision Documents unreasonable or of no effect.

Regarding the lot coverage restriction, the Circuit Court found:

50. Defendants' plans, for which the Building Permit was issued, show that the lot coverage of Defendants' proposed construction is 39%. The proposed construction exceeds the allowed lot coverage.

51. <u>Therefore, the Court finds that Defendants' proposed construction violates the lot coverage restriction under the Subdivision Documents</u>.

(Emphasis added; footnote omitted).

---

[7]     Although the Circuit Court found that the Browns' proposed construction would violate Method 2, it did not make a specific finding that the Brown property qualifies as a house with "setbacks greater than that required."

17

On August 29, 2016, the Circuit Court entered the Summary Judgment Order, which concluded that the Browns' Motion for Partial Summary Judgment, which was filed on June 7, 2016, was moot in light of the court's rulings on the Browns' motion for judgment as a matter of law during the trial on the merits.

Regarding Plaintiffs' request for attorneys' fees, the Circuit Court determined that the Subdivision Documents "provide for the payment of attorneys' fees and costs to a party who successfully brings an enforcement action under the Subdivision Documents." The Circuit Court concluded that because it had "found Defendants to be in violation of the Subdivision Documents . . . Plaintiffs may be awarded reasonable attorneys' fees and costs." After Plaintiffs' counsel filed a declaration regarding attorneys' fees and costs, the Circuit Court entered a separate order, awarding Plaintiffs $141,738.45, inclusive of attorneys' fees in the amount of $124,201.41 and costs in the amount of $17,537.04.

On September 20, 2016, the Browns filed a motion for reconsideration of the Order on Counts II and III, which the Circuit Court denied on December 15, 2016. On January 24, 2017, Plaintiffs filed a Motion for Supplemental Attorneys' Fees and Costs, requesting fees and costs incurred responding to the Browns' motion for reconsideration and for expert witness fees. Plaintiffs sought expert witness fees "on the grounds that Plaintiffs' expert witnesses were part of and necessary to the enforcement action and [are] therefore awardable under the

18

subject Subdivision Documents." Alternatively, Plaintiffs requested expert witness fees "as a sanction against Defendants' bad faith post-trial conduct toward Plaintiffs' expert witness." Specifically, Plaintiffs cited Mr. Brown's email to Johnson threatening to file an ethics complaint, pursue criminal charges, and seek revocation of his architectural license if he did not inform the Circuit Court in writing "that the only correct Method 1 height rule for [Waialae-Iki View Lots] has always been 18-feet horizontal."

Following a hearing on the motion, the Circuit Court granted the request for additional attorneys' fees and costs related to opposing the Browns' motion for reconsideration and denied the request for additional expert fees as untimely sought and because the Subdivision Documents "do not expressly and specifically provide for a non-standard, extraordinary cost such as expert witness fees, to be awarded." The Circuit Court declined to award additional expert witness fees alternatively as a sanction for "bad faith" but stated that "[u]nder this Court's inherent court powers under HRS § 603-21.9, for Mr. Brown's harassing and improper conduct, Defendants shall pay the attorneys' fees and costs Plaintiffs incurred in bringing this motion."

Judgment was entered on February 21, 2017. The Browns timely appealed.

II.   POINTS OF ERROR

The Browns raise nine points of error on appeal, contending that the Circuit Court erred: (1) in finding that the height restriction at issue in this case is not ambiguous and finding that, even if an ambiguity exists, it is not a substantial ambiguity; (2) by applying the general rule of contract interpretation, i.e., the intent of the parties, rather than the rule applicable to restrictive covenants, which requires all doubts be resolved in favor of the free use of the land; (3) in finding that the height restriction at issue should be interpreted to impose an 18 foot height limit that follows the preexisting grade of the lots (or, alternatively, that any such restriction was abandoned); (4) by applying an interpretation of the height restriction that can only be reached after a trained architect reviews the relevant documents, as opposed to applying the plain language of the covenant; (5) when it determined that "Method 2" for the height restriction applies only to a house that is is not as wide as it could be under the Subdivision Documents and the applicable ordinances; (6) when it looked only to the lot coverage shown in the plans submitted in support of the Browns' building permit application to determine that "the proposed construction exceeds the allowed area coverage;" (7) by determining that the proposed construction violated the height restriction and lot coverage restriction; (8) in granting a preliminary injunction; and (9) in awarding Defendants' attorneys' fees and costs.

20

III. APPLICABLE STANDARDS OF REVIEW

"In construing restrictive covenants governing the use of land, we are guided by the same rules that are applicable to the construction of contracts. The fundamental rule is that the intent of the parties, as gleaned from the entire context of the covenant, governs." Pelosi v. Wailea Ranch Estates, 10 Haw. App. 424, 435-36, 876 P.2d 1320, 1326-27 (1994) (internal citation omitted) (citing DeMund v. Lum, 5 Haw. App. 336, 343 n.7, 690 P.2d 1316, 1322 n.7 (1984)). "As long as the terms of a covenant are not ambiguous, i.e., not 'capable of being reasonably understood in more ways than one,' we are required to interpret the terms 'according to their plain, ordinary, and accepted sense in common speech.'" Id. at 1327, 876 P.2d at 1327 (quoting Cho Mark Oriental Food, Ltd. v. K & K Int'l, 73 Haw. 509, 520, 836 P.2d 1057, 1064 (1992)). Whether a covenant's language is ambiguous is a pure question of law, which this court reviews de novo. Hiner v. Hoffman, 90 Hawai'i 188, 190, 977 P.2d 878, 880 (1999); see also Brown v. KFC Nat'l Mgmt. Co., 82 Hawai'i 226, 239, 921 P.2d 146, 159 (1996). Moreover, if the language of the covenant is clear and unambiguous, and the meaning of the covenant can be readily discerned from the instrument itself, the legal effect and construction of the covenant is also a question of law. Pelosi, 10 Haw. App. at 436, 876 P.2d at 1327.

"[A] trial court's FOFs are subject to the clearly erroneous standard of review. An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is

21

left with the definite and firm conviction that a mistake has been committed." Chun v. Bd. of Trs. of the Employees' Ret. Sys. of the State of Hawaiʻi, 106 Hawaiʻi 416, 430, 106 P.3d 339, 353 (2005) (citations, internal quotation marks and ellipses omitted). "An FOF is also clearly erroneous when the record lacks substantial evidence to support the finding." Leslie v. Estate of Tavares, 91 Hawaiʻi 394, 399, 984 P.2d 1220, 1225 (1999) (citation and internal quotation marks omitted). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (citation omitted).

> A COL is not binding upon an appellate court and is freely reviewable for its correctness. [The appellate court] ordinarily reviews COLs under the right/wrong standard. Thus, a COL that is supported by the trial court's FOFs and that reflects an application of the correct rule of law will not be overturned.

Chun, 106 Hawaiʻi at 430, 106 P.3d at 353 (citations, internal quotation marks, and original brackets omitted).

> Generally, the granting or denying of injunctive relief rests with the sound discretion of the trial court and the trial court's decision will be sustained absent a showing of a manifest abuse of discretion. Abuse of discretion may be found where the trial court lacked jurisdiction to grant the relief, or where the trial court based its decision on an unsound proposition of law.

Sierra Club v. Dep't of Transp. of State of Hawaii, 120 Hawaiʻi 181, 197, 202 P.3d 1226, 1242 (2009) (citation omitted).

> [The appellate] court reviews the denial and granting of attorney's fees under the abuse of discretion standard. The same standard applies to [the appellate] court's review of the amount of a trial court's award of attorney's fees. An abuse of discretion occurs if the trial court has clearly exceeded the bounds of reason or has disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

22

Chun, 106 Hawai'i at 431, 106 P.3d at 354 (citations, internal quotation marks, and ellipses omitted).

IV. DISCUSSION

The parties agree that the Waialae-Iki View Lots, including the Subject Lot, are subject to certain restrictive covenants, including the lot area coverage and height restrictions at issue in this case. As stated in the first of the Subdivision Documents, the original developers sought, inter alia, to "develop and maintain the general attractiveness of the subdivision, as seen from all public areas, to provide each lessee as much undisturbed view and unobstructed breeze as practicable, [and] to promote esthetic standards for the buildings and their relationships to each other." The developers emphasized, however, in describing view planes, view channels, and view easements, that they were not guaranteeing any unobstructed views.

With respect to the height restriction stated in the Subdivision Documents, the parties do not agree as to how the drafters intended the restriction to be applied, based on the language of the height restriction provision. With respect to the lot area coverage, the dispute appears to center on whether the Circuit Court erred in basing its decision on the building plans submitted to the Department of Planning and Permitting of the City and County of Honolulu (DPP), which issued a building permit based on those plans, as opposed to the proposed construction described at trial by the Browns' witnesses, which

23

included removing three existing trellises, which would "reduce nonconformities without bringing the structure fully into compliance." We will address each in turn, as well as the other issues raised in the Browns' points of error.

A.    The Height Restriction

The Browns contend that the Circuit Court erred in interpreting the height restriction set forth in the Subdivision Documents by concluding that the height restriction was not ambiguous, or not "substantially ambiguous," based on an interpretation that was not grounded in the express language of the height restriction, and then, by failing to resolve any doubts against the party seeking enforcement of the restriction and in favor of the grantee of the burdened property.

The Hawai'i Supreme Court has long held:

> [R]estrictive covenants are to be liberally construed in favor of the grantee and against the grantor, and substantial doubt or ambiguity is to be resolved in favor of the free and unrestricted use of property. Although in some instances restrictive covenants may increase the value of property, they do nonetheless raise title problems and impair alienability. Therefore, restrictive covenants are to be strictly construed against the grantor because the limitations and prohibitions they impose may be felt over a very long period of time, and it is not too much to insist that they be carefully drafted to state exactly what is intended no more and no less. In thus attempting to construe ambiguous covenants, a court must look to the expressed intention of the parties as may be ascertained from the entire language of the covenant agreement.

Collins v. Goetsch, 59 Haw. 481, 485, 583 P.2d 353, 356-57 (1978) (citations, quotation marks, parentheses, and footnote omitted).

The supreme court has similarly stated:

> Restrictive covenants restrain the free use of property and are strictly construed in favor of the grantee of the property and against the grantor. The general rule does not favor restrictions imposed upon the use of land, but rather the unrestricted use of property. The party

> seeking to enforce a restrictive covenant in a deed has the burden to prove the parties' clear intention to create a covenant that would run with the land.
>
> . . . .
>
> When construing a restrictive covenant, the parties' intentions are normally determined from language of the deed. . . . Substantial doubt or ambiguity is resolved against the person seeking its enforcement. If the language of the deed is ambiguous, surrounding circumstances may be considered but not parol evidence. Because the covenant is unclear as to its intended beneficiary, we look to the circumstances surrounding the creation of the covenant. The use of surrounding circumstances, also known as extrinsic evidence, usually concerns the geographical location of the lands and the physical condition of the structures thereon.

Waikiki Malia Hotel, Inc. v. Kinkai Props. Ltd. P'ship, 75 Haw. 370, 382, 384-85, 862 P.2d 1048, 1056-58 (1993) (citations and quotation marks omitted); see also Hiner, 90 Hawai‘i at 190-91, 977 P.2d at 880-81 ("when construing a restrictive covenant, the parties' intentions are normally determined from the language of the deed" and that "substantial doubt or ambiguity is resolved against the person seeking its enforcement" (citations, internal quotation marks, brackets, and emphasis omitted)).[8]

The parties agree that the height restriction in the Subdivision Documents consists of two methods of achieving compliance with the restriction, and it states:

> [Method 1:] No portion of any building or other structure, except antennas and chimneys, shall be more than 18 feet above **the highest existing ground elevation at the building or structure**.
>
> [Method 2:] For houses with setbacks greater than that required, the height shall not project above an imaginary plane constructed over the building area as follows:

---

[8] Although the dissent in Hiner disagreed with the majority's conclusion that the restrictive covenant in that case was ambiguous, it agreed that "[t]he fundamental rule in construing restrictive covenants is the intention of the parties as shown by the covenant governs." Hiner, 90 Hawai‘i at 196, 977 P.2d at 886 (Nakayama, J., dissenting) (citations and emphasis omitted).

(1)  Commencing at a corner of the building area with the highest ground elevation, measure vertically to a point 18 feet above the corner-This point shall be a corner of the "height plane".

(2)  Slope this plane downward at a ratio of 1 vertical to 10 horizontal towards the corner of the building area with the lowest ground elevation.

(Format altered; emphasis added).

Under Method 1, a property's compliance is plainly determined by reference to the "building or other structure['s]" height *at* – not *commencing at* – "the highest existing ground elevation at the building or structure."

Under Method 2, a property's compliance is determined by reference to the lot's "building area," more specifically, by applying certain measurements and calculations "*commencing at*" the corner of the "building area" with the highest ground elevation.  "Building Area" is defined in the Subdivision Documents as "that portion of the lot lying outside of the setback and view channel areas of the lot."  "Setback Lines" are defined primarily with respect to municipal zoning requirements.[9] "View Channels" are as indicated on a particular subdivision map, which is identified as Bishop Estate Map No. 8043-F.

The Browns contend that the Circuit Court's analysis regarding the "ambiguity" of this covenant is flawed.  This argument has merit.  The Circuit Court erred when it based its conclusion that height restriction is not ambiguous on the testimony of the Plaintiffs' expert witnesses and the

---

[9]  In certain circumstances, a 19-foot setback was applicable to a garage or carport, but this additional setback was subject to variances from the original developer.

"reasonableness" of various interpretations, rather than the language of the covenant. In COL 64, the court concluded:

> 64. <u>Based on the [FOFs] above, the Court concludes that the Subdivision Documents' provisions regarding the Height Restriction are not ambiguous.</u> While a facial ambiguity exists when reading Method 1 in isolation, the ambiguity is resolved when both Method 1 and Method 2 are read together as a whole.

(Emphasis added).

The threshold question of whether a restrictive covenant's language is ambiguous or not ambiguous is "a pure question of law." <u>See</u>, <u>e.g.</u>, <u>Hiner</u>, 90 Hawai'i at 190, 977 P.2d at 880. Apparently based on expert opinions, rather than a legal determination based exclusively on the express language of the covenant, the Circuit Court concluded that "a facial ambiguity exists when reading Method 1 in isolation." The Circuit Court erred in failing to first make a legal determination that the express language of the height restriction was or was not ambiguous. If, as a matter of law, the express language of the covenant is unambiguous, then there is no basis for a factual inquiry into the "reasonableness" of the restriction as drafted.[10] As discussed below, if the court determined, as a matter of law, that the height restriction is ambiguous, then extrinsic evidence of "circumstances surrounding the creation of the covenant" may be considered, but not parol evidence or expert

---

[10] This should not be read to suggest that a finding as to the "reasonableness" of an interpretation of an ambiguous covenant leads to a conclusion that the interpretation is enforceable in the absence of the expressed intention of the original parties or grantor, as ascertained from the entire covenant agreement. "In the determination of the meaning of language used in restrictive covenants, the controlling factor is expressed intent, and unexpressed intent is generally 'unavailing.'" <u>Collins</u>, 59 Haw. at 487, 583 P.2d at 358 (citation omitted).

opinions that embellish or otherwise vary the actual terms of the restriction. See, e.g., Waikiki Malia Hotel, Inc., 75 Haw. at 384-85, 862 P.2d at 1057-58.

Moreover, we conclude that the Circuit Court erred in its conclusion. On its face, Method 1 is plain and unambiguous: "[n]o portion of any building or other structure, except antennas and chimneys, shall be more than 18 feet above the highest existing ground elevation at the building or structure." The maximum allowed height of a building is measured at the highest existing ground elevation at the building. Nothing, except an antenna or chimney, can exceed 18 feet above that reference point, i.e., that particular elevation.[11]

Although a bit more complicated, we also conclude that Method 2 is, on its face, unambiguous.[12] As stated above, unlike Method 1, Method 2 is drafted in reference to the "building area" of the lot itself, rather than in reference to a building or

---

[11] Although not addressed by the Circuit Court, and therefore not at issue in this appeal, we note that, in describing the initially-required site plan drawings, the Subdivision Documents distinguish between "existing" and "proposed" topography. In reference to grading, the Subdivision Documents state that the lots were to be accepted "as is, as of the date of completion of all contracts for the grading and roadway and utility improvements for the subdivision" or the date of acceptance of a lot lease application, whichever is later. Reading these provisions together with the reference to "highest existing ground elevation," the developers plainly intended that the height restriction is determined based on the topography and elevation conditions "existing" as of the "as is" date, and not determined, for example, based on the topography and elevation conditions resulting from cutting and/or filling done by a lot owner after that date.

[12] Both parties' expert witnesses agreed on the interpretation of Method 2. See FOFs 36 and 37 (set forth above). The Circuit Court does not state whether it concluded, as a matter of law, that Method 2 was ambiguous or unambiguous. As discussed above, if the Circuit Court had concluded that Method 2 was unambiguous, then the various expert opinions on this particular point were irrelevant. We recognize, of course, that expert testimony may be of assistance to the court in determining factual issues concerning whether the Browns' proposed construction would violate the height restriction.

structure on the lot.[13] It is undisputed that Method 2 plainly applies only if the house is built (or to be built) with setbacks greater than required – in other words, only if the house does not extend to the limits of the building area. In that case, the method for determining whether the house complies with the height restriction commences at a corner of the building area (not the house) with the highest ground elevation. Eighteen vertical feet up from that point, that particular corner of the *building area*, is designated as a "corner" of a "height plane." From that corner of the height plane, Method 2 imposes an imaginary plane over the entire building area, sloping downward at a 1:10 vertical to horizontal ratio towards the corner of the building area with the lowest ground elevation. The height of the house cannot project above that imaginary plane. Notably, unlike Method 2, Method 1 is stated in terms of a single, not-to-exceed, point of elevation and is not drafted with reference to any downward sloping imaginary plane.

We further conclude, contrary to the Circuit Court's findings, it is unnecessary to delve into whether a plain-language reading of the entire height restriction impairs an unexpressed rationale for Method 2. Method 1 plainly applies no matter where on the lot a house is built, whether the house is built utilizing the maximum building area by abutting the setbacks or whether it occupies a narrower or smaller footprint;

---

[13]    It appears from the Circuit Court's FOFs that the court did not recognize this distinction. See, e.g., FOFs 41-43 (set forth above).

no portion of the house (except antennas and chimneys) can exceed 18 feet above a particular point of elevation.  Period.  Method 2 appears to be equally mandatory – the height **shall not** project above an imaginary plane – but Method 2 only applies to houses with setbacks greater than required.

As Plaintiffs have argued, the Subdivision Documents express a clear intent to promote undisturbed views, unobstructed breezes, aesthetic standards, and an attractive residential district.  The Subdivision Documents contain no hint of any intent to create a "height bonus" for smaller or narrower houses, as argued by Plaintiffs and found to be a "reasonable" interpretation by the Circuit Court.  On the contrary, the Subdivision Documents expressly mandate a "minimum enclosed floor area of 2,000 square feet" and specify no maximum (beyond the lot area coverage restriction).  Even if the height restriction was ambiguous, it is irrelevant to the determination of the grantor's intent that, as the Circuit Court found, "[a] homeowner would have no reason to choose Method 2."[14]

For these reasons, we conclude that the Circuit Court erred in adopting "Plaintiffs' interpretation" of Method 1, which would in effect add a "sloping plane" requirement to the express requirement stated in Method 1.

---

[14]     Arguably, a height penalty for a smaller home is more consistent with the stated intent of the original developers than a height bonus for a smaller house.  The Subdivision Documents express an intent for houses of at least a certain size, costs of not less than a certain amount, garages of not less than a certain size, materials of a superior custom-designed-home quality, and an absence of any structure, tree, hedge or other impediment above a view plane.

30

In addition, the Circuit Court made no specific findings as to whether the Browns' proposed construction would have setbacks greater than required, and accordingly, whether both Method 1 and Method 2 applied to the Browns' proposed construction. Instead, the Circuit Court concluded that the Browns' proposed construction "does not comply with either Method 1 or Method 2, as construed and applied herein." However, it appears to be undisputed on appeal – based in part on the Plaintiffs' statement in their Answering Brief that "the parties disagree as to whether the [Browns'] proposed construction is in compliance with Method 1" – that Plaintiffs did not establish that the Browns' proposed construction had setbacks greater than required. As noted above, there are no Circuit Court findings that the Browns' proposed construction has setbacks greater than required. Accordingly, Method 2 is inapplicable and the Plaintiffs' burden was to establish that the Browns' proposed construction violated the height restriction as determined by Method 1. As the Circuit Court erred in adopting and applying Plaintiffs' interpretation of Method 1 to the Browns' proposed construction, we further conclude that the Circuit Court erred in its findings and conclusions that the Browns' proposed construction does not comply with Method 1. Further proceedings are necessary to determine whether the Browns' proposed construction complies with Method 1. As there are no factual findings supporting the applicability of Method 2 here, we simply

31

vacate the Circuit Court's findings and conclusions that the Browns' proposed construction does not comply with Method 2.

B.    Lot Coverage Area Restriction

The Browns contend that the Circuit Court erred in finding that the proposed construction would violate the lot coverage area restriction described in the Subdivision Documents. The Browns argue that the Circuit Court should not have relied solely on the percentage cited in the drawings the Browns submitted to DPP in their building permit application.  The Browns further argue that the Circuit Court failed to address "the fact" that, at a minimum, their proposed construction would reduce a pre-existing nonconformity.

The lot coverage area restriction provides that the area of the building "under roof and trellis work within the wall lines and/or the outer vertical support members (including balcony railings) of all buildings on the lot," shall not exceed one-third of the area of the lot.  The Circuit Court found that the plans "for which the Building Permit was issued, show that the lot coverage of [the Browns'] proposed construction is 39 [percent]."  While the Browns argue that this percentage was not calculated using the definition of "lot coverage area" in the Subdivision Documents, they cite no evidence to support a conclusion that, after their proposed construction, the lot coverage area would be in compliance with the unambiguous requirement that it "shall not amount to more than one-third (1/3) of the area of the lot."

The Browns rely heavily on the argument that, based on the testimony offered at trial, the proposed construction would eliminate three existing trellises and would not add new areas "under roof or trellis" that would increase the currently existing lot area coverage. However, we cannot conclude that the Circuit Court erred in relying on the square footage calculations that were actually submitted to, and approved by, the DPP. Although not included in the Circuit Court's factual findings, it appears to be undisputed that the total lot area is 9075 square feet. The Plaintiffs submitted evidence that after the Browns' proposed construction, the lot coverage area would exceed one-third of the area of the lot, i.e., 3025 square feet. The Browns point to no evidence in the record that, after their proposed construction, the lot coverage area would not be more than 3025 square feet. On the record in this case, we cannot conclude that the Circuit Court erred in finding that the Browns' proposed construction would violate the lot coverage area restriction in the Subdivision Documents.

The Browns' further argument that the Circuit Court failed to address their contention that, at a minimum, their proposed construction would reduce a pre-existing nonconformity appears to be based on municipal zoning ordinance provisions that address renovations of nonconforming residences. However, the Browns provide no authority supporting the proposition that these zoning provisions limit the enforceability of the restrictive covenants in the Subdivision Documents, which are indisputably

more restrictive than applicable zoning requirements in numerous ways.[15]

On the record in this case, we cannot conclude that the Circuit Court erred in ruling that the lot coverage area reflected in building plans submitted by the Browns to DPP would violate the lot coverage area restriction in the Subdivision Documents.

C.    Preliminary and Permanent Injunction

The Browns argue that the Circuit Court erred in entering the May 26, 2016 Order Granting Preliminary Injunction. The preliminary injunction, however, was mooted[16] by the permanent injunction that was included in the Circuit Court's August 12, 2016 Order on Counts II and III, which states:

> IT IS FURTHER ORDERED that Defendants are permanently enjoined from proceeding with construction as shown in Defendants' proposed construction plans; [and]
>
> IT IS FURTHER ORDERED that Defendants are permanently enjoined from violating the Subdivision Documents in any matter [sic], including but not limited to proceeding with

---

[15]    However, we note that, to the extent a homeowner would seek to enforce historical violations of the Subdivision Documents against properties in the Waialae-Iki View Lots, it would be the homeowner's burden to establish that the existing building or structure was not approved by the Trustees' design review committee as either compliant with the Subdivision Documents or by way of a permitted variance pursuant to Article II of the original Building Requirements. In addition, defenses not applicable to proposed or newly constructed homes might apply to pre-existing homes with alleged violations.

[16]    In addition, the Preliminary Injunction states "the Court finds that with respect to the height restriction only, the Plaintiffs have met the requirements for issuance of a preliminary injunction." In light of our disposition of the height restriction issue, we conclude that the Circuit Court based its decision on an unsound legal analysis. See Sierra Club, 120 Hawai'i at 197, 202 P.3d at 1242. The Preliminary Injunction further states that its prohibition is in effect "until such time as the [Circuit Court] has ruled on the merits of this case or further order of this [Circuit Court]." Thus, we conclude that the Preliminary Injunction expired, by its own terms, upon the entry of the Order on Counts II and III.

other construction plans that violate the Subdivision
Documents[.]

In conjunction with our disposition of the issues
raised by the Browns, and pursuant to Hawai'i Rules of Civil
Procedure Rule (**HRCP**) 65(d),[17] we conclude the first paragraph of
the permanent injunction is not specific enough in its terms and
does not describe in reasonable and sufficient detail the act or
acts to be restrained.  We further conclude that the second
paragraph of the permanent injunction must be stricken as it
states an overly broad prohibition that is not specific in its
terms, does not describe in reasonable and sufficient detail the
act or acts to be restrained, purports to rule on, *inter alia*,
other construction plans that were not before the Circuit Court,
and does not appear to be grounded in the evidence and arguments
presented to the Circuit Court in this case.

D.    Attorneys' Fees

The Browns contend that the Circuit Court erred in
awarding attorneys' fees to Plaintiffs under the relevant
provision of the Subdivision Documents, which states:

> [The Waialae-Iki View Lots] owners . . . shall each have the
> right, but not the responsibility, to enforce any or all of
> the limitations, restrictions, covenants and conditions

---

[17]    HRCP Rule 65(d) provides:

> **(d) Form and scope of injunction or restraining order.**
> Every order granting an injunction and every restraining
> order shall set forth the reasons for its issuance; shall be
> specific in terms; shall describe in reasonable detail, and
> not by reference to the complaint or other document, the act
> or acts sought to be restrained; and is binding only upon
> the parties to the action, their officers, agents, servants,
> employees, and attorneys, and upon those persons in active
> concert or participation with them who receive actual notice
> of the order by personal service or otherwise.

> imposed by this Declaration by any proceeding at law or in equity <u>against any person or persons violating or attempting to violate</u> any such limitation, restriction, covenant or condition, and <u>any judgment for any such violation</u> may require all costs and expenses of such enforcement action, including a reasonable attorney's fee, to be <u>paid by the person who the court finds in violation</u> of any such limitation, restriction, covenant or condition.

(Emphasis added).

While the provision clearly grants the Plaintiffs the right to enforce attempted violations of the Subdivision Documents through court proceedings, the plain language of the provision limits the award of costs, expenses, and reasonable attorneys' fees to cases in which there is a "judgment for any such <u>violation</u> . . . to be paid by the person who the court finds <u>in violation</u>." The Circuit Court, in granting the Plaintiffs' request for attorneys' fees and costs, stated that it "found Defendants' to be in violation of the Subdivision Documents." However, the gravamen of these proceedings was to obtain a declaration that the Brown's proposed construction would be in violation of the Subdivision Documents (Count III) and to obtain injunctive relief in order to *prevent* such a violation (Count II). The record does not support a conclusion that the Browns were in violation of the Subdivision Documents as it is undisputed that they have not completed or even begun construction on their proposed addition. Thus, the Circuit Court clearly erred in finding the Browns to be in violation of the Subdivision Documents.

Accordingly, the Circuit Court erred in entering the Attorneys' Fees Order.

The Circuit Court also based the Supplemental Fees Order, in part, on the inherent power of the court set forth in Hawaii Revised Statutes (**HRS**) § 603-21.9 (2016).[18] The supreme court has recognized that Hawai'i courts "have the inherent power and authority to control the litigation process before them and to curb abuses and promote fair process." Bank of Hawaii v. Kunimoto, 91 Hawai'i 372, 387, 984 P.2d 1198, 1213 (1999) (internal quotation marks and footnote omitted). Under this power, a court may order a party to pay an opposing party's attorney's fees and costs as a sanction for abusive litigation practices. Kukui Nuts of Hawaii, Inc. v. R. Baird & Co., Inc., 7 Haw. App. 598, 624, 789 P.2d 501, 517 (1990).

However, a court may not invoke its inherent power for this purpose absent a specific finding of bad faith. Id. "Bad faith" is defined as "actual or constructive fraud or a neglect or refusal to fulfill some duty . . . not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." Bank of Hawaii, 91 Hawai'i at 390, 984 P.2d at 1216; see also Kaina v. Gellman, 119 Hawai'i 324, 330, 197 P.3d

---

[18]    HRS § 603-21.9 provides:

   **§ 603-21.9 Powers.** The several circuit courts shall have power:

. . .

    (6)    To make and award such judgments, decrees, orders, and mandates, issue such executions and other processes, and do such other acts and take such other steps as may be necessary to carry into full effect the powers which are or shall be given to them by law or for the promotion of justice in matters pending before them.

37

776, 782 (App. 2008). Although the words "bad faith" need not be explicitly stated in the sanctioning order, the court must make findings "tantamount to a specific finding of bad faith," *i.e.*, "findings that are sufficient to enable [the appellate court] to infer a specific finding of bad faith by the circuit court." Id. at 390, 984 P.2d at 1216.

Here, the Circuit Court ordered Defendants to pay the attorneys' fees and costs Plaintiffs incurred in bringing the Motion for Supplemental Attorneys' fees "for Mr. Brown's harassing and improper conduct." The Circuit Court characterized the conduct as "consist[ing] of using improper and coercive tactics to change or influence a witness's prior testimony after the Court had already rendered a decision, undermin[ing] the litigation process before this Court." However, the Circuit Court expressly denied Plaintiffs' request "as a sanction for 'bad faith'" because an "alleged violation of a criminal statute [*i.e.*, witness intimidation] cannot be used as a basis for sanctions in a civil lawsuit." The Circuit Court therefore "made no finding of bad faith, or finding tantamount to a finding of bad faith." See, e.g., In re Marn Family Litigation, No. 29448, 2013 WL 514255, *3 (Haw. App. Feb. 12, 2013) (SDO). To the contrary, the Circuit Court specifically declined to find bad faith on the part of Mr. Brown.[19] Accordingly, to the extent the

---

[19]  Moreover, the Circuit Court's order is devoid of any reference to purported conduct by *Mrs.* Brown that could constitute a finding of "bad faith" and thus, even if the Circuit Court had made a sufficient finding of bad faith on the part of Mr. Brown, the Circuit Court erroneously ordered *both*

(continued...)

Circuit Court ordered Defendants to pay attorneys' fees and costs pursuant to its inherent powers under HRS § 603-21.9, it plainly erred.[20]  Thus, we vacate the Circuit Court's Supplemental Attorneys' Fees Order.

V.    CONCLUSION

For these reasons, we vacate the Circuit Court's February 21, 2017 Judgment, December 20, 2016 Attorneys' Fees Order, August 12, 2016 Order on Counts II and III (in part, consistent with this conclusions herein), and March 21, 2017 Supplemental Fees Order.  This case is remanded to the Circuit Court for further proceedings consistent with this Opinion.

On the briefs:

Bruce D. Voss,
Christian D. Chambers,
(Bays Lung Rose & Holma),
for Defendants-Appellants.

Michael W. Gibson,
Francis P. Hogan,
(Ashford & Wriston),
for Plaintiffs-Appellees.

---

[19](...continued)
"Defendants" to pay the awarded attorneys' fees and costs without having made specific findings of "bad faith" on the part of *both* defendants.

[20]    Although the Browns challenged the Supplemental Fees Order on appeal, they failed to specifically identify it in their points of error. Nevertheless, applying the three-factor test to determine whether to exercise this court's discretionary power to notice plain error, we conclude that this case satisfies each.  Okada Trucking Co., Ltd. v. Bd. of Water Supply, 97 Hawai'i 450, 458, 40 P.3d 73, 81 (2002).  Under the first factor, "based on the tenet that an appellate court should not review an issue based on an undeveloped record," the record here clearly and sufficiently provides the Circuit Court's factual basis for awarding the supplemental attorneys' fees and costs.  The error here also affects the integrity of the Circuit Court's findings of fact, because of the extent to which the Circuit Court relied on its finding that Mr. Brown's conduct was "harassing and improper" in awarding supplemental attorneys' fees and costs.  Finally, eradicating this improper exercise of the circuit courts' inherent power is an issue of "great public import."  See, e.g., Montalvo v. Lopez, 77 Hawai'i 282, 290-91, 884 P.2d 345, 353-54 (1994) (applying the three-factor test).